# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------x

In re:                    :

ADVANTA CORP., *et al.*        :

           Debtors.*       :

---------------------------------------------------------------------x

ADVANTA BANK CORP.,        :

           Plaintiff,       :

-against-               :

ADVANTA CORP.,           :

           Defendant.      :

---------------------------------------------------------------------x

Chapter 11

Case No. 09-13931 (KJC)

(Jointly Administered)

Adversary Proceeding
No.: 10-50795 (KJC)

**RE: D.I. 25, 26**

**Hearing Date: June 8, 2010 at 10:00 a.m.**
**Reply Deadline: June 4, 2010 at 5:00 p.m.**

## PRELIMINARY OBJECTION TO
## MOTION OF THE FEDERAL DEPOSIT INSURANCE
## CORPORATION, AS RECEIVER OF ADVANTA BANK CORP., SEEKING A
## DECLARATION THAT THE AUTOMATIC STAY DOES NOT APPLY OR, IN THE
## ALTERNATIVE, AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY

---

* The Debtors in these jointly administered chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Advanta Corp. (2070), Advanta Investment Corp. (5627), Advanta Business Services Holding Corp. (4047), Advanta Business Services Corp. (3786), Advanta Shared Services Corp. (7074), Advanta Service Corp. (5625), Advanta Advertising Inc. (0186), Advantennis Corp. (2355), Advanta Mortgage Holding Company (5221), Advanta Auto Finance Corporation (6077), Advanta Mortgage Corp. USA (2654), Advanta Finance Corp. (8991), Advanta Ventures Inc. (5127), BizEquity Corp. (8960), ideablob Corp. (0726), Advanta Credit Card Receivables Corp. (7955), Great Expectations International Inc. (0440), Great Expectations Franchise Corp. (3326), and Great Expectations Management Corp. (3328). Information regarding the Debtors' businesses and the background relating to the events leading up to these chapter 11 cases can be found in (i) the Declaration of William A. Rosoff in Support of the Debtors' Chapter 11 Petitions and First-Day Motions, filed on November 8, 2009 (the "***Rosoff Declaration***"), the date the majority of Debtors filed their petitions under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), and (ii) that certain supplement thereto, filed on November 20, 2009, the date Advanta Ventures Inc., BizEquity Corp., Ideablob Corp. and Advanta Credit Card Receivables Corp. filed their chapter 11 cases. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Further, in accordance with an order of this Court, the Debtors' cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

## TABLE OF CONTENTS

Preliminary Statement .................................................................................................. 1

Background .................................................................................................................. 4

Objection ..................................................................................................................... 8

I.     The Receiver's Filing of the Receiver Competing Returns Is Subject to the
Automatic Stay ...................................................................................................... 8

    a.     The 2008 and 2009 NOLs Are Property of Advanta's Estate ................... 8

    b.     The Receiver Is Seeking to Exercise Control Over Property of the Estate ......... 11

    c.     The Receiver Is Subject to the Automatic Stay With Respect to the
Receiver Competing Returns .......................................................................... 13

II.     Cause Does Not Exist to Lift the Automatic Stay ............................................... 15

    (1)     Advanta's Estate Will Be Significantly Prejudiced by the Filing of
the Receiver Competing Returns ............................................................. 16

        i.     Paragraph 2(a) (Payments by Member Companies to
Advanta Corp.) ................................................................................ 17

        ii.     Paragraph 4 (Separate Member Loss) ............................................. 18

        iii.     Fourth Recital ................................................................................... 19

        iv.     Other Claims .................................................................................... 21

    (2)     Any Harm to the Receiver Is Outweighed by the Harm to Advanta ....... 22

    (3)     The Probability of the IRS Accepting the Receiver Competing
Returns Is Speculative ............................................................................. 23

III.     Relief from the Automatic Stay Is Premature ................................................... 26

Conclusion .................................................................................................................. 27

US_ACTIVE:\43401202\09\78221 0007

# TABLE OF AUTHORITIES

## CASES

Page

*BSD Bancorp, Inc. v. FDIC (In re BSD Bancorp, Inc.)*, No. 93-12207-A11 (S.D. Cal. 1995)...........................................................................................................1, 10, 25

*In re Benalcazar*, 283 B.R. 514 (Bankr. N.D.Ill. 2002).........................................14

*In re Birchall*, 2007 WL. 1992089 (Bankr. D. Mass. July 3, 2007) .....................14

*In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d 262 (9th Cir. 1973) ....................25

*Case v. N.Y. Cent. R.R. Co.*, 204 N.E.2d 643 (N.Y. 1965) ....................................22

*City & County of San Francisco v. PG &E Corp.*, 433 F.3d 1115 (9th Cir. 2006)...........14

*In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir. 1992).......................................15

*In re Continental Airlines, Inc.*, 152 B.R. 420 (D. Del. 1993) ............................16

*Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora (In re Corporacion de Servicios Medicos Hospitalarios de Fajardo)*, 805 F.2d 440 (1st Cir. 1986) ...............................................................................................14

*Cournoyer v. Town of Lincoln*, 790 F.2d 971 (1st Cir. 1986)...............................14

*Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd*, 182 B.R. 859 (D. Kan. 1995) .................................10, 25

*In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) .................................9

*Gibson v. United States (In re Russell)*, 927 F.2d 413 (8th Cir. 1991)...............................9

*In re Grossman's, Inc.*, 1997 WL. 33446314 (Bankr. D. Del. 1997)....................................8

*In re Hohol*, 141 B.R. 293 (M.D. Pa. 1992) .........................................................16

*Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513 (Del. Super. Ct. 2005)...........20

*Izzarelli v. Rexene Prods. Co. (In re Rexene Prods., Co.)*, 141 B.R. 574 (Bankr. D. Del. 1992)........................................................................................................16

*Javens v. City of Hazel Park (In re Javens)*, 107 F.3d 359 (6th Cir. 1997)........................14

*Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL. 925853 (Del. Ch. Mar. 16, 2010)................21

*In re Laguna Assocs. Ltd.*, 30 F.3d 734 (7th Cir. 1994) ..........................................................15

*In re Lincoln*, 264 B.R. 370 (E.D. Pa. 2001) .........................................................................16

*Marvel Enter. Group, Inc. v. Mafco Holdings, Inc. (In re Marvel Enter. Group, Inc.)*, 273 B.R. 58 (D. Del. 2002) ...................................................................................9, 22

*Meyerson v. El Paso Natural Gas Co.*, 246 A.2d 789 (Del. Ch. 1967)..............................22

*Nelson Dairies Inc. v. Royal*, 6 Pa. D. & C. 2d 371, 71 Mont. County L. Rep. 403, 1956 WL. 8287 (Pa. Com. Pl. 1956) ..............................................................................19

*In re NextWave Personal Commc'n Inc.*, 244 B.R. 253 (Bankr. S.D.N.Y. 2000) .............14

*Official Comm. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.)*, 928 F.2d 565 (2d Cir. 1991), *cert. denied*, 502 U.S. 821 (1991)............8, 9, 12

*In re Phar-Mor, Inc.*, 152 B.R. 924 (Bankr. N.D. Ohio 1993).....................................12, 13

*Prestancia Mgmt. Group, Inc. v. Virginia Heritage Foundation, II LLC*, 2005 WL. 1364616 (Del. Ch. May 27, 2005)...........................................................................22

*Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192 (Del. 1992) ..........................................................................................................19, 20

*Sunshine Dev., Inc. v. Fed. Deposit Ins. Corp.*, 33 F.3d 106 (1st Cir. 1994) ..............14, 15

*Superintendent of Ins. V. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209 (2d Cir. 2004) ......................................................................................................................10, 25

*Team Financial*, 2010 WL. 1730681 (same) .........................................................................25

*Team Financial, Inc. v. FDIC (In re Team Financial, Inc.)*, 2010 WL. 1730681 (Bankr. D. Kan. Apr. 27, 2010) ...............................................................................9, 10

*United Dominion Industries, Inc. v. United States*, 532 U.S. 822 (2001)...............................9

*W. Pac. R.R. Corp. v. W. Pac. R.R. Co.*, 197 F.2d 994 (9th Cir. 1951), *vacated on procedural grounds*, 345 U.S. 247 (1953)........................................................22

*In re Wilson*, 116 F.3d 87 (3d Cir. 1997)................................................................15

## STATUTES

11 U.S.C. § 105(a) ................................................................................................12

11 U.S.C. § 362(a)(3)........................................................................................8, 13, 15, 16

26 C.F.R. §§ 1.1502-11(a), -21(a) ........................................................................9

26 C.F.R. § 1.1502-32(b)(2), (3)(i)......................................................................11

26 C.F.R. § 1.1502-75(h)(1) ................................................................................13

26 C.F.R. § 1.1502- 75(h)(1) ..............................................................................23

26 C.F.R. § 1.1502-77(a)(1)(i)..............................................................................5

26 C.F.R. § 1.508-1(a)(1), (2)..............................................................................24

26 C.F.R. § 1.597-4(g).....................................................................................10, 11

26 U.S.C. § 165(g).................................................................................................11

26 U.S.C. § 172(b)(3) .............................................................................................5

26 U.S.C. § 301.6402-7(f) ...................................................................................26

And 26 C.F.R. § 301.6402-7.............................................................................5, 13, 23, 24

Tax Code and 26 C.F.R. § 1.6012-3(b)(4).............................................................13

United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq......................................8

Advanta Corp. ("*Advanta*"), as debtor and debtor in possession in the above-referenced jointly administered chapter 11 cases, submits this preliminary objection (the "*Objection*") to the motion, dated May 14, 2010 (the "*Motion*"), of the Federal Deposit Insurance Corporation (the "*FDIC*"), as receiver of Advanta Bank Corp. (the "*Receiver*" or "*ABC*"), seeking a declaration that the automatic stay does not apply or, in the alternative, an order granting relief from the automatic stay, and respectfully represents as follows:[1]

### Preliminary Statement

1.    This Motion is yet another attempt by ABC and the Receiver to supplant Advanta's business judgment and substantially dilute the recoveries of Advanta's existing creditors. The Receiver seeks stay relief to (i) file competing tax returns (the "*Receiver Competing Returns*") for the Advanta consolidated federal income tax group (comprised of Advanta and various subsidiaries including ABC) with respect to the 2008 and 2009 taxable years, (ii) make certain elections thereunder to carry back net operating losses ("*NOLs*") for 2008 and 2009 that are property of Advanta's estate reversing the elections Advanta made with respect to the NOLs in the tax returns that Advanta filed on March 14, 2010 for the consolidated tax group for the taxable years 2008 (the "*Amended 2008 Return*") and 2009 (the "*2009*

---

[1] As Advanta argued to the Court at a telephonic hearing on May 26, 2010 (the "*Status Conference*"), Advanta does not believe that this Motion or the Emergency Motion for Declaratory and Injunctive Relief filed by ABC on March 19, 2010 (Adv. Proc. D.I. 9) (the "*Third Emergency Motion*") should be ruled on absent a determination by the Court – with the Court having the benefit of an evidentiary hearing at which Advanta would offer, among other things, expert testimony regarding the application of accounting principles expressly incorporated in the TSA (as defined below) – of all claims or issues that ABC or the Receiver has raised or will raise regarding the TSA and Advanta's tax elections. Per the Court's instructions at the Status Conference, Advanta will be submitting to the Court on June 3, 2010 a letter further setting forth its views on the best procedure for, and scheduling of, the adjudication of the TSA-related disputes. In the meantime, Advanta is filing this preliminary Objection, but reserves all rights to supplement this Objection, including to supplement its existing arguments, respond to arguments made by the Receiver, and introduce new arguments, including based on the testimony of any fact and/or expert witness.

*Return*" and, together with the Amended 2008 Return, the "*Tax Returns*"), and (iii) claim for itself – not the consolidated tax group – a refund attributable to the consolidated group's 2009 NOL to which ABC is not entitled.

2.    If the Motion is granted, the Receiver will exercise control over the NOLs, which are Advanta's property, to attempt to create an approximately $170 million claim against Advanta. This claim would dwarf any other creditor's claim and would dramatically reduce existing creditors' recoveries. The Motion is based on the faulty premise that the filing of the Receiver Competing Returns will not harm Advanta's estate because, according to what the Receiver (incorrectly) alleges, Advanta's election in the Tax Returns to carry back the consolidated group's 2008 NOL five years and waive the carry back of the consolidated group's 2009 NOL (the "*Tax Elections*") breached that certain Fourth Amended and Restated Tax Sharing Agreement, dated as of May 1, 1995, by and between Advanta and its wholly-owned direct and indirect subsidiaries (the "*TSA*"); indeed, the Receiver alleges that such a "breach" already has created a claim against Advanta in the amount of at least $170 million. This breach allegation is not supported by facts or law. To the contrary, as discussed below, and as Advanta will establish at trial, the Tax Elections did not breach the TSA and ABC has no claims resulting from the Tax Elections.

3.    The Receiver has shown no basis to justify lifting the automatic stay imposed by section 362 of the Bankruptcy Code (the "*Automatic Stay*") to permit the filing of the Receiver Competing Returns. First, lifting the Automatic Stay has the potential to harm Advanta and its creditors severely by allowing the Receiver to attempt to manufacture an enormous claim against Advanta's estate. Second, keeping the Automatic Stay in place will not harm ABC because it already is receiving the full benefit that it bargained for under the TSA.

The fact that Advanta took actions that prevented the crystallization of contingent claims under the TSA is not a "harm." Third, any benefit to the Receiver is speculative at best: the Tax Elections are irrevocable elections that have been made on timely-filed returns and the time for making the elections has expired. Contrary to its assertions, the Receiver has no right to make new elections because the due date for the return passed before its appointment as receiver. Moreover, even if the Internal Revenue Service (the "*IRS*") accepts the Receiver Competing Returns, the approximately $54 million tax refund that the Receiver claims would actually be property of Advanta's estate.

      4.     In any event, there is no reason to lift the Automatic Stay *now*. The Motion is predicated on the Receiver's interpretation of the TSA, which the Debtors vigorously dispute, and the Receiver has not moved for summary judgment about its rights under the TSA – because it cannot given that discovery has not yet commenced. So, despite using the alleged breach of the TSA as the foundation of the Motion, the Receiver has failed to place before the Court its claims under the TSA. In fact, the Receiver filed a proof of claim in which it asserted additional theories of damages in respect of the TSA and the Tax Elections,[2] and has informed the Debtors that it may seek to further amend the complaint in this Adversary Proceeding to assert new theories if the Court denies the Motion and/or the Third Emergency Motion. In essence, the Receiver is looking for ultimate relief without ever having to prove its case and without giving Advanta the opportunity to take discovery.

      5.     A pivotal issue in the Debtors' chapter 11 cases – whether ABC has claims under the TSA or otherwise in connection with the Tax Elections – should not be litigated in a disorganized, piecemeal fashion at the whim of the Receiver. And because there is no

---

[2] *See* Proof of Claim No. 2336, annexed hereto as *Exhibit "A"*.

deadline for the Receiver to file the Receiver Competing Returns (should the Court ever permit such a filing), the Receiver is not prejudiced by maintaining the Automatic Stay now.

6.      Accordingly, Advanta requests that the Court deny the Motion in its entirety in order to allow the issues surrounding the TSA to be decided in a fair and judicially economical way, which will conserve estate resources and allow a final resolution of all claims arising from the TSA and the Tax Elections. Following such proceedings, should the Court disagree with Advanta and agree with the Receiver that it has an approximately $170 million claim against Advanta under the TSA, Advanta would likely support the Receiver's filing of competing returns to make alternative elections, and would work with the Receiver to seek payment of the refund from the IRS. Under those circumstances, the IRS's payment of the refund would be in Advanta's best interest – but Advanta will not know that until the Court issues its final ruling on ABC's claims in respect of the Tax Elections.

## Background

7.      Advanta is the common parent of an affiliated group of corporations, including ABC, that files consolidated returns for federal income tax purposes. Consistent with applicable tax law, Advanta and its subsidiaries, including ABC, entered into the TSA prepetition.

8.      The Receiver does not dispute that Advanta, as the common parent corporation of the consolidated group, had *sole authority* (and therefore complete discretion) to act on behalf of the group in matters relating to tax liability for the consolidated return years (*See Opening Brief In Support of Motion of The Federal Deposit Insurance Corporation, as Receiver of Advanta Bank Corp. Seeking A Declaration That the Automatic Stay Does Not Apply Or, In The Alternative, An Order Granting Relief From The Automatic Stay*, dated May 14, 2010 (Adv. Proc. D.I. 26) (the "***Brief***"), ¶ 1). *See generally* 26 C.F.R. § 1.1502-77(a)(1)(i) (subject to

exceptions, "the common parent . . . for a consolidated return year is the sole agent (agent for the group) that is authorized to act in its own name with respect to all matters relating to the tax liability for that consolidated return year, for – (A) Each member in the group . . . .").[3]

9.      In the exercise of such uncontested authority, on March 14, 2010, one day before the IRS deadline, Advanta filed the Tax Returns. In the Amended 2008 Return, Advanta amended its previously-filed tax return for 2008 by electing to carry back the consolidated group's 2008 NOL five years, and, in the 2009 Return, Advanta elected to waive the carryback of any portion of the consolidated group's 2009 NOL.[4]

10.     Notwithstanding that ABC was aware for months of the NOL carryback issues and the filing deadline of March 15, 2010 for the Tax Returns, ABC waited until March 10, 2010 to send Advanta a letter requesting that Advanta file as soon as possible the 2009 Return and elect to carry back the 2009 NOL five years (a "*2009 Five Year Carryback*"). There was no suggestion in the letter that such a filing and election would require Court approval.

---

[3] Following the commencement of ABC's receivership and the satisfaction of certain notice requirements, the Receiver became a co-agent of the consolidated group for certain limited purposes pursuant to 26 C.F.R. § 301.6402-7(c)(1). However, the Tax Elections were made and the filing deadline for the Tax Returns passed before the Receiver acquired this co-agent status and the attendant rights, and there is nothing in the applicable tax regulations making such rights applicable to such returns.

[4] March 14, 2010 was the last day to prudently file the Tax Returns because of the need to avoid the risk of technical errors in transmitting the Tax Returns electronically to the IRS (Advanta is required to file the Tax Returns electronically). Indeed, Advanta's consistent practice has been to avoid waiting to file its tax returns until the actual IRS deadline. If Advanta did not timely file the Tax Returns, the default result would have been that the generally applicable two-year carryback would not have been waived with respect to the 2009 NOL (absent obtaining an extension of time to file the Tax Returns, which Advanta determined was not in the estate's best interests), as 26 U.S.C. § 172(b)(3) requires an election waiving the carryback of a NOL to be made on a timely-filed tax return for the year in which the NOL arises, and Advanta would have been exposed to a potential claim by ABC of up to approximately $71 million under the TSA (with a refund of approximately $27 million due from the IRS). Accordingly, the Debtors determined that it was not in the best interests of Advanta's estate to wait until after March 14, 2010 to file the Tax Returns.

11.     Late in the afternoon on Friday, March 12, 2010, ABC filed the

*Emergency Motion of Advanta Bank Corp. for Entry of an Order Compelling Debtor Advanta*

*Corp. to (I) Timely File a Request for an Extension of Time to File 2009 Consolidated Federal*

*Income Tax Return, or, in the Alternative (II) Elect to Carry Back 2009 Consolidated Net*

*Operating Losses Five Years* (the "***First Emergency Motion***") (D.I. 323). The First Emergency

Motion sought to compel Advanta to request an extension of time to file the 2009 Return or, in

the alternative, elect the 2009 Five Year Carryback. Notwithstanding the looming deadline to

file the Tax Returns, ABC did not file an adversary proceeding and seek a temporary restraining

order.[5] On March 15, 2010, Advanta filed an objection to the First Emergency Motion (the

"***First Emergency Motion Objection***") (D.I. 332), asserting that the First Emergency Motion

was procedurally flawed (because, among other reasons, it was not within an adversary

proceeding), partially moot, and lacking in authorities to substantiate the extraordinary relief

requested. The same day, the statutory committee of unsecured claim holders in the Debtors'

chapter 11 cases (the "***Committee***") filed a joinder to the First Emergency Motion Objection

(D.I. 333), in which it set forth its support for Advanta's decision to make the Tax Elections.[6]

12.     On March 14, 2010, ABC initiated this adversary proceeding (Adv. Proc.

D.I. 1). On March 19, 2010, ABC filed an Amended Complaint (Adv. Proc. D.I. 8) and the

Third Emergency Motion whereby ABC changed its legal theory to assert that, pursuant to

section 363(b) of the Bankruptcy Code, the Tax Elections were unauthorized transactions outside

---

[5] On March 14, 2010, ABC filed its *Emergency Motion of Plaintiff Advanta Bank Corp. for Temporary Restraining Order and Preliminary Injunctive Relief Against Defendant Advanta Corp.* (the "***Second Emergency Motion***") after commencing this adversary proceeding (Adv. Proc. D.I. 3). The Second Emergency Motion was subsequently withdrawn pursuant to the *Order Approving Stipulation*, which this Court signed on April 6, 2010 (Adv. Proc. D.I. 15).

[6] The First Emergency Motion was withdrawn with prejudice by the Receiver as moot pursuant to the Supplemental Scheduling Order entered on May 17, 2010 (Adv. Proc. D.I. 29).

of the ordinary course of Advanta's business and therefore void *ab initio*. Notwithstanding that Advanta clearly stated in the First Emergency Motion Objection that by making the Tax Elections it avoided triggering a potential claim of approximately $170 million under the TSA (*see* First Emergency Motion Objection at ¶ 24), the Third Emergency Motion made no allegation of any breach of the TSA caused by the Tax Elections. On April 30, 2010, Advanta filed its objection to the Third Emergency Motion (the "*Third Emergency Motion Objection*") (Adv. Proc. D.I. 17), explaining why the Tax Elections were within the ordinary course of Advanta's business. Also on April 30, 2010, the Committee joined in the Third Emergency Motion Objection (Adv. Proc. D.I. 18).

13.    On May 14, 2010, the Receiver filed its reply to the Third Emergency Motion Objection (the "*Third Emergency Reply*") (Adv. Pro. D.I. 24), in which it argued *for the first time* that the Tax Elections breached the TSA.

14.    Also on May 14, 2010, the Receiver filed the Motion and the Brief, which argue that the Automatic Stay does not apply to a filing of competing tax returns for the Advanta consolidated group by the Receiver and, in the alternative, that the Automatic Stay should be modified to permit the filing of the Receiver Competing Returns.

## Objection

## I.    The Receiver's Filing of the Receiver Competing Returns Is Subject to the Automatic Stay

15.    Section 362(a) of the Bankruptcy Code operates as a stay of, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Accordingly, "where a non-debtor's action with respect to an interest that is intertwined with that of a bankrupt debtor would have the legal effect of diminishing or eliminating property of the bankrupt estate, such action is

barred by the automatic stay." *Official Comm. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.)*, 928 F.2d 565, 574 (2d Cir. 1991), *cert. denied*, 502 U.S. 821 (1991).

        a.      The 2008 and 2009 NOLs Are Property of Advanta's Estate

        16.      NOLs and other tax attributes are property of a debtor's estate protected by section 362. *See In re Grossman's, Inc.*, 1997 WL 33446314, at *1 (Bankr. D. Del. 1997) ("The Debtors' net operating loss carryforward is property of the Debtors' estates and is protected by the automatic stay of § 362 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq."). The Second Circuit, in its seminal *Prudential Lines* decision (928 F. 2d 565 (2d Cir. 1991)), affirmed the application of the automatic stay and upheld a permanent injunction prohibiting a parent corporation from taking a "worthless stock" deduction for the stock of its debtor subsidiary because doing so would have adversely affected the subsidiary's ability to use its NOLs under the special relief provisions of section 382 of title 26 of the United States Code (the "**Tax Code**"). The Second Circuit stated:

> Including NOL carryforwards as property of a corporate debtor's estate is consistent with Congress' intention to "bring anything of value that the debtors have into the estate."

*Id.* at 573 (internal citations omitted); *see also In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) ("Property of the estate 'includes all interests, such as . . . contingent interests and future interests, whether or not transferable by the debtor.'") (quoting *Prudential Lines*, 928 F.2d at 572); *Gibson v. United States (In re Russell)*, 927 F.2d 413, 417 (8th Cir. 1991) (concluding the "right to carry forward the [debtor's] NOLs" was a "property interest" of the estate); *In re Delta Air Lines, Inc.*, Ch. 11 Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) (finding that tax credit carryforwards were property of the debtors' estates and approving notification procedures and restrictions on certain transfers of claims against and interests in the debtors to protect, among other things, $346 million in non-NOL tax credits); *In re Enron Corp.*,

Case No. 01-16034 (Bankr. S.D.N.Y. 2003) (finding that the debtors' NOL carryforwards "are property of the debtors' estates and are protected by the automatic stay prescribed in section 362 of the Bankruptcy Code").

17.    Advanta's consolidated tax group's 2008 NOL is property of Advanta's estate. That NOL was generated entirely by losses of Advanta and its non-ABC subsidiaries in 2008. ABC clearly has no interest in the 2008 NOL because ABC generated approximately $34 million of *positive* net taxable income on a separate company basis in 2008. Therefore, ABC did not produce losses in 2008 that contributed to the consolidated group's 2008 NOL.

18.    The consolidated group's 2009 NOL also is property of Advanta's estate even though it stemmed in significant part from losses of ABC. This is because there is only one consolidated NOL per taxable year for a consolidated group, and it is an attribute of the consolidated group, though its computation is a function of the income and losses of the group members. *See* 26 C.F.R. §§ 1.1502-11(a), -21(a), (e); *see also United Dominion Industries, Inc. v. United States*, 532 U.S. 822, 830 (2001) ("Given this apparently exclusive definition of NOL as CNOL [consolidated NOL] in the instance of affiliated entities with a consolidated return … we think it is fair to say … that the concept of separate NOL 'simply does not exist.'"). As held by the District of Delaware, NOLs attributable to a subsidiary in a consolidated tax group are not assets of the subsidiary. *See In re Marvel Enter. Group, Inc.*, 273 B.R. 58, 72-73 (D. Del. 2002) ("In the context of the consolidated tax filing group, the hypothetical stand-alone NOLs that were calculated for purposes of the Tax Sharing Agreement were not property of [the subsidiary] because they were a legal fiction … Accordingly, … [the parent's] application of NOLs attributable to [the subsidiary] in the Federal income tax filings of [the parent's] consolidated

group does not constitute a transfer from [the subsidiary] to [the parent] that is cognizable under the Bankruptcy Code.").

19.     Moreover, by entering into the TSA, ABC relinquished any property interest that it even could have had in the consolidated group's NOLs (whether or not attributable to ABC's losses) in exchange for the contractual rights set forth in the TSA. As recognized by the courts in *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 211 (2d Cir. 2004), *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 159 B.R. 9, 29 (Bankr. D. Kan. 1993), *aff'd*, 182 B.R. 859 (D. Kan. 1995), and *Team Financial, Inc. v. FDIC (In re Team Financial, Inc.)*, 2010 WL 1730681, *8-*12 (Bankr. D. Kan. Apr. 27, 2010), when a parent and its consolidated subsidiary tax group members enter into a written tax sharing agreement with terms similar to those found in the TSA, the subsidiary members relinquish any property rights they possess in the consolidated group's tax attributes in exchange for their rights under the tax sharing agreement.[7] Additionally, if Advanta elects to deconsolidate ABC effective as of immediately prior to ABC's being placed in receivership (as permitted by 26 C.F.R. § 1.597-4(g) within 120 days of the inception of the receivership, *i.e.*, on or before July 17, 2010), the deconsolidated ABC will not succeed to the portion of the consolidated group's 2009 NOL attributable to ABC's losses. *See* 26 C.F.R. § 1.597-4(g)(4)(i).

20.     Finally, were the 2009 NOL to be carried back, Advanta's tax basis in the stock of ABC – which is similarly property of the estate – would be reduced by roughly the same amount. As discussed below, the IRS's discretionary acceptance of the Receiver Competing Returns would diminish the value of this property.

---

[7] As discussed below, the TSA is wholly unlike the tax sharing agreement at issue in *BSD Bancorp, Inc. v. FDIC (In re BSD Bancorp, Inc.)*, No. 93-12207-A11 (S.D. Cal. 1995), the unpublished decision cited by the Receiver.

b.     The Receiver Is Seeking to Exercise Control Over Property of the Estate

21.     The filing by the Receiver of the Receiver Competing Returns would be an exercise of control by the Receiver over Advanta's NOLs. In so doing, the Receiver would ask the IRS to apply an asset of Advanta's – the NOLs – in a manner contrary to Advanta's wishes and that would harm Advanta. If the IRS then accepted the Receiver Competing Returns, which would be solely a discretionary action (*see* Brief at ¶ 20), the refund from the IRS could trigger a liability from Advanta to ABC under the TSA of up to approximately $170 million, with the effect of materially reducing recoveries to existing unsecured creditors in Advanta's chapter 11 case.

22.     In addition to the harm to Advanta resulting from the triggering of a claim under the TSA, should the Receiver Competing Returns be filed and accepted by the IRS, Advanta will suffer a meaningful reduction in the amount of its tax basis in its ABC stock. *See* 26 C.F.R. § 1.1502-32(b)(2), (3)(i) (providing that absorption of the portion of a consolidated NOL attributable to a subsidiary's operations results in a corresponding decrease in the parent's tax basis in its stock in the subsidiary). Assuming that ABC is insolvent, the stock basis will make available to Advanta a "worthless stock" loss (in lieu of the portion of the consolidated group's NOLs attributable to ABC).[8] *See* 26 U.S.C. § 165(g). The use of the "worthless stock" loss, unlike the use of any NOLs attributable to ABC, would not result in a claim under the TSA. This stock loss could offset in whole or in part any gains triggered during the remainder of Advanta's chapter 11 case, pursuant to the terms of its chapter 11 plan or, potentially, after consummation of the chapter 11 plan. Therefore, any reduction in this stock basis, such as

---

[8] In the event that Advanta electively deconsolidates ABC as of immediately prior to ABC's receivership, Advanta would be immediately entitled to the worthless stock loss. *See* 26 C.F.R. § 1.597-4(g)(2)(v).

would occur if the Receiver Competing Returns are filed and accepted by the IRS, diminishes an asset of Advanta's estate.

23. In *Prudential Lines*, the Second Circuit held that the parent corporation's attempt to claim a worthless stock deduction in stock of its debtor subsidiary effectively would eliminate the value of the debtor's NOLs and, thus, would be an act to exercise control over estate property in violation of the Automatic Stay. *Prudential Lines*, 928 F.2d at 573-574. The Second Circuit determined that, if the parent were permitted to take a "worthless stock" deduction, it would have an adverse impact on the debtor subsidiary's ability to carry forward its NOLs. The Second Circuit thus held that, "despite the fact that the [parent corporation's] action is not directed specifically at [the debtor subsidiary], it is barred by the automatic stay as an attempt to exercise control over property of the estate." *Id* [9] The Second Circuit also held that the permanent injunction was supported by the court's equitable powers pursuant to section 105(a) of the Bankruptcy Code, which authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." *Id* ; *see also* 11 U.S.C. § 105(a).

24. Similarly, in *In re Phar-Mor, Inc* , 152 B.R. 924 (Bankr. N.D. Ohio 1993), chapter 11 debtors moved to prohibit transfers of their stock that could have an adverse effect on their ability to use NOLs. The court held that the NOLs qualified as property of the estate and issued an injunction and enforced the Automatic Stay, thereby protecting the assets of the debtors' estates. The court granted the relief requested even though the stockholders did not

---

[9] In the present case, unlike in *Prudential Lines*, the parent is the corporation in bankruptcy and it is the parent's interest in the consolidated NOL that the Automatic Stay protects, even if the subsidiary may also have an interest therein. Moreover, the subsidiary in *Prudential Lines* had not relinquished any property rights that it possessed in the consolidated NOL by entering into a tax sharing agreement with its parent, as ABC did here.

state any intent to sell their stock and even though the debtors did not show that a sale was pending that would trigger the prescribed ownership change under section 382 of the Tax Code. *See id.* at 927. Despite the "ethereal" nature of the situation, the court observed that "[w]hat is certain is that the *NOL has a potential value, as yet undetermined*, which will be of benefit to creditors and will assist debtors in their reorganization process." *Id* (emphasis added). The *Phar-Mor* court also concluded that, because the debtors were seeking to enforce the stay, they did not have to meet the more stringent requirements for preliminary injunctive relief:

> The requirements for enforcing an automatic stay under 11 U.S.C. § 362(a)(3) do not involve such factors as lack of an adequate remedy at law, or irreparable injury, or loss and a likelihood of success on the merits. The key elements for a stay . . . are the existence of property of the estate and the enjoining of all efforts by others to obtain possession or control of property of the estate.

*Id.* at 926 (quoting *In re Golden Distribs., Inc.*, 122 B.R. 15, 19 (Bankr. S.D.N.Y. 1990)).

25. These cases establish that it is well settled that the Automatic precludes actions that would adversely affect a debtor's tax position and its NOLs.

c. The Receiver Is Subject to the Automatic Stay With Respect to the Receiver Competing Returns

26. In seeking to lift the Automatic Stay to allow the filing of the Receiver Competing Returns, the Receiver's objective is to maximize the value of ABC's assets at the expense of Advanta's existing unsecured creditors. The Receiver is subject to the Automatic Stay with respect to the Receiver Competing Returns, as demonstrated below, as it is not acting in its capacity as a governmental unit to enforce its police or regulatory powers, but rather seeks to use these proceedings solely to advance its own pecuniary interest.[10]

---

[10] Moreover, the Receiver's contention that it is obligated under the tax law to file the Receiver Competing Returns is incorrect. Section 6012(b)(3) of the Tax Code and 26 C.F.R. § 1.6012-3(b)(4), both of which are cited by the Receiver in support of this contention, merely require a fiduciary to file returns in the same manner and form as the corporation otherwise would. Since a subsidiary in a

27.     While, under section 362(b)(4) of the Bankruptcy Code, "the automatic stay does not reach proceedings undertaken to enforce a 'governmental unit's police or regulatory power'" (*see Sunshine Dev., Inc. v. Fed. Deposit Ins. Corp.*, 33 F.3d 106, 114 n.8 (1st Cir. 1994)), the legislative history of section 362(b)(4) makes clear that the exception contained in section 362(b)(4) was intended to be given a "narrow construction" and was not intended to apply "to actions by a governmental unit to advance its own 'pecuniary interest.'" *In re Benalcazar*, 283 B.R. 514, 530 (Bankr. N.D.Ill. 2002); *accord In re NextWave Personal Commc'n Inc.*, 244 B.R. 253, 273-74 (Bankr. S.D.N.Y. 2000). Furthermore, for the exception to apply, "the governmental unit must bring the action in its capacity as a regulator, or a private party acting as a private attorney general." *In re Birchall*, 2007 WL 1992089, at *7 (Bankr. D. Mass. July 3, 2007) (citing *Cournoyer v. Town of Lincoln,* 790 F.2d 971, 974 (1st Cir. 1986); *Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora (In re Corporacion de Servicios Medicos Hospitalarios de Fajardo),* 805 F.2d 440 (1st Cir. 1986); *Javens v. City of Hazel Park (In re Javens),* 107 F.3d 359 (6th Cir. 1997)).

28.     The phrase "police or regulatory power" is not defined in the Bankruptcy Code, but has been interpreted to refer to the "enforcement of laws affecting health, welfare, morals and safety, but not regulatory laws that directly conflict with the control of the property of the bankruptcy estate." *City & County of San Francisco v. PG &E Corp.*, 433 F.3d 1115, 1123 (9th Cir. 2006).

---

consolidated group cannot file a consolidated return for the group – it is the parent's duty to file this return – these provisions are irrelevant. *See* 26 C.F.R. § 1.1502-75(h)(1) ("The consolidated return shall be made on Form 1120 for the group by the common parent corporation."). And 26 C.F.R. § 301.6402-7, which the Receiver also cites in support of its contention, merely permits a fiduciary to file a competing tax return, but does not obligate it to do so.

29.     Specifically, courts have held that where the FDIC is acting in its capacity as receiver, it is not exercising "regulatory powers" that would exempt the FDIC from the strictures of the automatic stay. *Sunshine*, 33 F.3d at 114 n.8 (citing *Howell v. FDIC*, 986 F.2d 569, 574 (1st Cir. 1993)). Indeed, courts have denied the FDIC's request to find that it has powers that override both substantive and procedural law governing bankruptcy cases simply because enforcement of those bodies of law constrain the FDIC's powers related to assets in which it has interests as successor to a failed bank, as is the case with ABC. *See, e g , In re Colonial Realty Co* , 980 F.2d 125 (2d Cir. 1992).

30.     The Receiver cites several cases that purportedly support its argument that the Automatic Stay does not apply to acts it commits in its capacity as a receiver (Brief at ¶ 14), but none involves bankruptcy cases or provisions of the Bankruptcy Code, much less the application of the Automatic Stay. In fact, the only relevant cases cited in the Brief are cases in which appellate courts held that the Receiver is *not* exempt from the Automatic Stay when acting in its capacity as a receiver. *See Sunshine*, 33 F.3d at 114 n.8; *Colonial Realty*, 980 F.2d 125 (Brief at ¶ 14, n. 4).

## II.     Cause Does Not Exist to Lift the Automatic Stay

31.     Section 362(d) of the Bankruptcy Code provides, in relevant part, as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay – (1) for cause...

11 U.S.C. § 362(d). "Cause" is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay. *See, e.g , In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997); *In*

*re Laguna Assocs. Ltd.*, 30 F.3d 734, 737 (7th Cir. 1994); *In re Continental Airlines, Inc.*, 152

B.R. 420, 424 (D. Del. 1993). As one court phrased it,

> There is no rigid test for determining when an unsecured creditor…has
> established cause to warrant relief from the automatic stay. Instead the cases
> recognize that the bankruptcy court's exercise of discretion in resolving motions
> for relief for "cause" must appropriately consider the policies underlying the
> Bankruptcy Code as well as the competing interests of the creditor, debtor, and
> other parties in interest. Each request for relief for "cause" under § 362(d)(1)
> must be considered on its own facts. *In re Hohol,* 141 B.R. 293 (M.D. Pa. 1992);
> *In re Lincoln*, 264 B.R. 370 (E.D. Pa. 2001) (KJC).

    32.    In *Izzarelli v. Rexene Prods. Co. (In re Rexene Prods., Co.),* 141 B.R. 574,

576 (Bankr. D. Del. 1992), this Court established the following three-prong analysis for

determining whether cause exists to modify the stay to allow an action to continue: (i) whether

the debtor or the estate will suffer great prejudice if the action is continued; (ii) balancing of the

hardships faced by the debtor and the moving party; and (iii) the probability that the moving

party will succeed on the merits in the action. *See* 141 B.R. at 576.

    (1)    *Advanta's Estate Will Be Significantly Prejudiced by the Filing of the*
                    *Receiver Competing Returns*

    33.    If the relief sought by the Receiver is granted and the Receiver proceeds to

file the Receiver Competing Returns, Advanta expects that the Receiver will make the 2009

Five-Year Carryback election, thereby creating a potential general unsecured claim against

Advanta by ABC of up to approximately $170 million if the Receiver Competing Returns are

accepted by the IRS. The Receiver does not dispute this fact.

    34.    The Receiver contends, however, that Advanta's estate will not be

prejudiced by the lifting of the Automatic Stay because it alleges that ABC will have a claim in

the amount of approximately $170 million against Advanta in all circumstances, and that

Advanta therefore is better off if the Receiver files the Receiver Competing Returns and is able

to obtain an approximately $54 million refund that would either belong to Advanta or partially

offset the approximately $170 million claim if it is paid to ABC (Brief at ¶ 39). The basis for this allegation is the Receiver's assertion that the Tax Elections breached the TSA and gave rise to a $170 million claim of ABC against Advanta. But as demonstrated below, Advanta has not breached the TSA, has not generated a $170 million claim to ABC by filing the Tax Returns, and will be put at risk of enormous prejudice by the lifting of the Automatic Stay and the filing of the Receiver Competing Returns. Accordingly, the Receiver has not made any showing that it would have a claim against Advanta based on the waiver of the 2009 Five-Year Carryback election.

35. The Receiver cites three paragraphs of the TSA to support its contention. But an examination of each shows that the Tax Elections did not breach such paragraphs. The TSA simply neither requires that Advanta make any particular tax elections nor provides for a claim by one member of Advanta's consolidated group if it does not like tax elections made by Advanta.

       *i.    Paragraph 2(a) (Payments by Member Companies to Advanta Corp.)*

36. Paragraph 2(a) (*Payments by Member Companies to Advanta Corp.*) of the TSA, which the Receiver relies upon to support its claim of breach (Brief at ¶¶ 41-42), provides:

> If on any Adjustment Date there is a Separate Member Tax and the tax payment then due from the Affiliated Group is in excess of the amount of the Separate Member Tax, then the Member shall pay to Advanta Corp. an amount equal to the Separate Member Tax. No member shall pay to Advanta Corp. an amount in excess of the amount which would have been payable on a separate company basis.

The Receiver's reliance on this provision addressing payments by subsidiaries in the group to Advanta to argue a breach of contract claim against Advanta is misplaced. ABC made no

payment to Advanta relating to the 2009 taxable year. This section of the TSA is simply inapplicable to the Tax Returns.[11]

ii    *Paragraph 4 (Separate Member Loss)*

37.    The Receiver also is mistaken in its reliance on Paragraph 4 (*Separate Member Loss*) of the TSA (Brief at ¶ 43). Paragraph 4 provides:

> If on any Adjustment Date the separate return computation for a Member would show a loss but not a Separate Member Refund, Advanta Corp. shall pay to the Member an amount equal to the amount of the loss which results in a tax benefit, determined in a manner consistent with the allocation of tax due to taxable Members, from those losses on the consolidated return.

This provision of the TSA plainly does not have the meaning ascribed to it by the Receiver, namely that: "where a member is injured as a result of the filing of a consolidated return, a member pays more than the other members, or a member is deprived of a tax benefit it would otherwise receive, the TSA provides that Advanta is to pay the member the difference" (Brief at ¶ 43). Such construction takes a narrow provision and adopts a meaning not found in the text. A plain reading of Paragraph 4 shows that this provision merely applies where a member has a loss but not a Separate Member Refund (as defined in the TSA), and such loss results in a tax benefit on the group's consolidated return by means of reducing the taxable income of other members of the group.[12] But the consolidated group has not realized any tax benefit from ABC's 2009 loss: because the non-ABC members of the consolidated group generated a net loss in 2009, ABC's loss was not needed to offset other income in the group in 2009. Rather than providing a

---

[11] The Receiver argues that ABC's inability to collect a refund for the 2009 tax year is the equivalent of a payment by ABC (Brief at ¶ 42). But there was no right to a refund. A refund would only have become due if the 2009 Five-Year Carryback election was made. Accordingly, any claim arising from a refund was contingent. The failure of a contingency to occur is not a payment to Advanta as contemplated by Paragraph 2(a).

[12] Paragraph 4 provides that a payment to a member is required to be made only when the member's loss "results in a tax benefit... from those losses on the consolidated return" as "determined in a manner consistent with the allocation of tax due to taxable Members".

realized tax benefit, ABC's loss merely increased the amount of the consolidated 2009 NOL, *which has not been utilized*. Therefore, Paragraph 4 does not support the Receiver's contention that Advanta breached the TSA.

### iii.    Fourth Recital

38.    The Receiver's reliance on the fourth recital to the TSA (Brief at ¶ 40) (the "***Fourth Recital***") likewise is misplaced.[13] The Fourth Recital is not an operative provision of the TSA, and is only relevant when interpreting contractual provisions that are ambiguous. *See, e.g., Nelson Dairies Inc. v. Royal*, 6 Pa. D. & C.2d 371, 71 Mont. County L. Rep. 403, 1956 WL 8287 (Pa. Com. Pl. 1956) (when the recital provisions and the operative provisions of a contract conflict, the operative provisions, unless ambiguous, should control).

39.    Although the parties disagree on the interpretation of the TSA, neither contends that the language of the TSA is ambiguous. Under Delaware law, a contract is not ambiguous simply because the parties disagree as to the meaning of its terms. *See Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."). A contract is ambiguous only if the provisions in question are "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 546 (Del. Super. Ct. 2005) (*citing*

---

[13] The fourth recital reads: "WHEREAS, it is the intention of the parties that if such consolidated returns are filed, each Member company should contribute its fair and equitable share to the taxes payable by the Affiliated Group or compensation for the reduction in the net operating loss deduction, capital loss deduction, or other tax benefit of the Affiliated Group resulting from the inclusion of the Member Companies in the Affiliated Group, but that in any event, the filing of such consolidated returns shall be beneficial rather than disadvantageous to each Member company ... and that each Member company should not with respect to any year, or part thereof, for which it is a Member of the Affiliated Group be required to pay more in lieu of taxes or receive a payment in lieu of a refund less than it would have paid or received if the Member company had at all times computed and paid its tax liability on a separate return basis. It is intended that this will comply with the pro rata method as described in SFAS 109 and its interpretation and all consideration of regulatory accounting principles."

*Rhone-Poulenc,* 616 A.2d at 1196). Advanta submits that the two operative sections of the TSA cited by the Receiver clearly do not give rise to a claim by ABC against Advanta.

40.    But even if it were appropriate to look to the recitals to interpret the TSA, while the Debtors agree with the Receiver that the TSA generally is intended to benefit its members through the filing of a consolidated tax return, it cannot be argued by extension that each consolidated return must be prepared, and all decisions must be made, so as to maximize the benefit *to ABC* rather than other members of the tax group or the group as a whole. If this was the intent of the parties, such a provision could have been explicitly agreed as part of the TSA – although it is unclear why other members of the group would ever agree to such a provision.

41.    Moreover, although the Fourth Recital contemplates that there be a computation of the amount a Member "would have paid or received if the Member company had at all times computed and paid its tax liability on a separate return basis," it also specifies that the intention of the parties is that this computation must "comply with the pro rata method as described in SFAS 109 and its interpretation and all consideration of regulatory accounting principles." This intention is expressly incorporated into the TSA's operative provisions: TSA § 1 provides that the computation of "Separate Member Tax" and "Separate Member Refund" are a function of "the accrued taxes or refund of tax properly reflected in the income statement, on a separate company basis, that should be reflected under generally accepted accounting principals [sic]." Under GAAP, separate company computations are governed by the elections and methods employed by the consolidated group. There are numerous elections, accounting method choices, and other variables inherent in the determination of a consolidated group's tax liability generally. Often the party making the elections will be forced to make elections and

choices that will inure to the benefit of one group member and the detriment of another, or vice versa. Interpreting the Fourth Recital to require separate company computations to be governed by each member's own hypothetical optimal elections and methods (rather than the same elections and methods as the consolidated group actually chose) would lead to absurd results and would be impossible to administer. If this was the specific intent of the parties to the TSA, the TSA would need to include extensive provisions governing the procedures to determine a group member's hypothetical elections and how those would affect the rights of all group members. The TSA includes no such provisions. *To the contrary, it requires that GAAP principles be used, which principles mandate that the parent's elections control.* Advanta is prepared to introduce expert testimony to support this assertion.

*iv.* <u>*Other Claims*</u>

42. The only other theories for damages arising from the Tax Elections that the Receiver articulates in the Brief are vague and not supported by any authority or detail. The Receiver alleges that Advanta, by making the Tax Elections, "violated its fiduciary duties under the TSA" (Brief at ¶¶ 2, 44) and "exposed itself to a breach of contract claim and tort claims with damages of at least $170 million" (Brief at ¶ 39). But the Brief does not explain what fiduciary duty Advanta has under the TSA, and does not even identify the torts supposedly committed by Advanta that give rise to a $170 million claim. The Receiver moreover cites no authority to support its theories.

43. Indeed, applicable case law provides that a contractual relationship generally does not create fiduciary duties. *See, e.g., Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 925853, *8 (Del. Ch. Mar. 16, 2010) ("Had defendants wanted everyone to enjoy a red rose of fiduciary duty, they should not have planted white roses of contractual obligations and now ask me to paint over them."); *Prestancia Mgmt. Group, Inc. v. Virginia Heritage Foundation, II*

*LLC*, 2005 WL 1364616, *6 (Del. Ch. May 27, 2005) ("The relationship between [the parties] was a bargained-for commercial relationship between sophisticated parties, a relationship that does not give rise to fiduciary duties.").[14] There is nothing in the TSA to indicate the creation of any fiduciary duty or any departure from established law on the subject.

        (2)    *Any Harm to the Receiver Is Outweighed by the Harm to Advanta*

     44.    The harm to Advanta should the Automatic Stay be lifted and the Receiver be allowed to proceed with the filing of the Receiver Competing Returns is clear: should the Receiver Competing Returns be accepted by the IRS, a claim under the TSA against Advanta will be generated in an amount of up to approximately $170 million, materially diminishing any recovery to creditors.

     45.    The harm to the Receiver from denying the Motion would not compare to the harm that granting the Motion would cause to Advanta. First, the Receiver would not be harmed by denying the Motion without prejudice to the ability of the Receiver to refile it after the Court has the opportunity to adjudicate all issues relating to the TSA and the Tax Elections because there are no IRS or other deadlines requiring the Receiver to file the Receiver Competing Returns prior to the adjudication of the TSA-related issues. Indeed, it is Advanta's understanding that there is no remaining action to be taken by the IRS with respect to the Tax

---

[14] Additionally, applicable case law clearly supports the notion that a parent has no fiduciary duty to its subsidiaries with respect to tax attributes. Indeed, Advanta owes no fiduciary duty to ABC to make or waive tax elections. It is well-established that a parent's decision regarding allocation of tax savings among affiliated group members should be reviewed under the deferential business judgment rule. *See Meyerson v. El Paso Natural Gas Co.*, 246 A.2d 789 (Del. Ch. 1967); *Case v. N.Y. Cent. R.R. Co.*, 204 N.E.2d 643 (N.Y. 1965); *W. Pac. R.R. Corp. v. W. Pac. R.R. Co.*, 197 F.2d 994 (9th Cir. 1951), *vacated on procedural grounds*, 345 U.S. 247 (1953). As a result of cases such as *Meyerson, Western Pacific*, and *Case*, a *per se* rule has evolved that a parent's decisions concerning the allocation of tax savings among consolidated group members (including a parent's entitlement to retain or take all tax savings for itself) is a business judgment with which courts generally will not interfere unless the evidentiary presumptions are overcome. *See also Marvel* 273 B.R. at 78-79 (applying business judgment rule to analysis of breach of fiduciary duty claims in connection with subsidiary's entry into consolidated group tax sharing agreement).

Returns, given that the 2009 Return sought no refund and the 2008 Amended Return has already been processed by the IRS, with the reapplication of a refund previously received by Advanta. The Receiver has the same ability to file the Receiver Competing Returns in October as it does now.

46. Second, as previously discussed, the Tax Elections did not breach or create any claims under the TSA. The Receiver may regret ABC's entry into the TSA, but it should not be allowed to argue that it has suffered harm by virtue of its receipt of the full benefit it bargained for in the TSA.

(3) *The Probability of the IRS Accepting the Receiver Competing Returns Is Speculative*

47. Contrary to the Receiver's assertion, sections 6012(b)(3) and 6402(k) of the Tax Code and 26 C.F.R. § 301.6402-7 (the "*6402-7 Regulation*") do not impose on the Receiver a duty to file competing tax returns (Brief at ¶ 46), and the 6402-7 Regulation cannot reasonably be interpreted to give the Receiver the right to file competing tax returns for tax years for which the deadline for filing a tax return has passed prior to it becoming a fiduciary.

48. Section 6012(b)(3) of the Tax Code provides that a fiduciary of a corporation has the same obligation to file a tax return for the corporation as the corporation had. However, where a corporation is a subsidiary member of a consolidated group, the duty to file the group's tax return falls upon the parent rather than the subsidiary. *See* 26 C.F.R. § 1.1502-75(h)(1) ("The consolidated return shall be made on Form 1120 for the group by the common parent corporation.").

49. Furthermore, the 6402-7 Regulation is not operative until a fiduciary is authorized to act as a receiver or conservator for a financial institution. *See* 26 C.F.R. § 301.6402-7(a)(1), (b)(4). Interpreting the 6402-7 Regulation in a way that permits the Receiver

to file competing returns for taxable years for which the deadline for filing a tax return has passed, and even for taxable years that have otherwise closed, before the Receiver's appointment as receiver would create havoc in the tax system. Indeed, were this the correct interpretation of the 6402-7 Regulation, one would reasonably expect to find in the 6402-7 Regulation provisions governing the number of prior years to which such a right would apply, and the applicability of the statute of limitations with respect to such right, or some explicit recognition that the fiduciary's rights apply retroactively.[15] But such provisions do not exist. It is therefore inappropriate to read the 6402-7 Regulation in a manner that extends the Receiver's right to file competing tax returns to taxable years for which the deadline to file a tax return has passed before the Receiver's appointment as receiver.

50.     Even if the 6402-7 Regulation is interpreted to permit a receiver to file a competing return for such tax years prior to the commencement of the receivership, the IRS has discretion not to accept competing returns. The Receiver provides no basis for its bald claim that the likelihood that the IRS will accept the Receiver Competing Returns is "very high" (Brief at ¶ 46). In fact, the IRS could easily reject the Receiver Competing Returns to avoid voluntarily paying an approximately $54 million refund that it otherwise would be forced to pay, as well as on the merits. All either the Receiver or Advanta can do is speculate as to whether the IRS would accept the Receiver Competing Returns.

51.     Furthermore, even if the IRS were to accept the Receiver Competing Returns and make a refund payment, this refund would belong to Advanta and not ABC because ABC relinquished any property rights that it had in refunds received by the Advanta consolidated

---

[15] For example, the Treasury regulations governing tax-exempt organizations provide that tax-exempt status shall be retroactive to a corporation's date of incorporation if the corporation files IRS Form 1023 within 15 months following such date, but if the form is not filed within such period, tax-exempt status is effective only upon the filing. 26 C.F.R. § 1.508-1(a)(1), (2).

group when ABC entered into the TSA. Courts considering this issue have regularly and consistently found that where a parent and subsidiary have entered into a tax sharing agreement like the TSA, a debtor/creditor relationship, not an agent/principal relationship or a constructive trust, is created with respect to a tax refund. *See, e.g., Ochs*, 377 F.3d at 211 (finding that a debtor/creditor relationship existed, and that "a constructive trust was not warranted . . . because the relationship between the parties was governed by a written agreement"); *Franklin Sav. Corp.*, 159 B.R. at 29 (holding that an agreement between a parent and its subsidiary regarding tax liability led to the creation of a debtor/creditor relationship); *Team Financial*, 2010 WL 1730681, *8-*12 (same).[16] The result is that any refund paid by the IRS in respect of Advanta's consolidated tax returns would belong to Advanta, and ABC could only assert an unsecured prepetition claim for any amounts to which it would be entitled under the TSA.[17]

---

[16] As with the Receiver's alleged claims in respect of the TSA, the Motion has implicated the dispute over ownership of any refund, but has not properly put the issue before the Court. If the issue becomes ripe for the Court's adjudication, the Debtors will more fully brief the issue and develop the factual record.

[17] The Receiver's authority in support of its argument that it is entitled to any refund because Advanta acts as its agent is not persuasive. *In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d 262, 265 (9th Cir. 1973) (Brief ¶ 48), is a Ninth Circuit case that does not control in this jurisdiction, and involves a fact pattern that is in no way similar to the present one: the case did not put a tax sharing agreement at issue, but the court expressly noted that parties are "free to adjust among themselves the ultimate tax liability" by agreement, which undermines the Receiver's argument that a principal-agent relationship is automatically created in such circumstances. Indeed, it is not clear why a principal would need its agent's agreement as to its entitlement to a tax refund – under ordinary principles of the law of agency, instructions to its agent would be sufficient for any amounts due to be paid over. The Receiver further cites *BSD Bancorp, Inc. v. FDIC*, No. 93-12207-A11 (S.D. Cal. 1995) (Brief Ex. C), an unpublished decision in the Southern District of California (and, thus, having no precedential value even within its own jurisdiction), with facts that are wholly distinguishable from the facts at issue here. In *BSD Bancorp*, the court focused on the language that it interpreted as requiring the parent to give its subsidiary "its share of the refund immediately and in cash," *id.* at 11, indicating that the parent was acting as a mere conduit for any funds actually received from the IRS. The TSA, on the other hand, envisions the obligation by Advanta to make a payment to its subsidiaries calculated with reference to a hypothetical Separate Member Refund (as such term is defined in the TSA).

## III.    Relief from the Automatic Stay Is Premature

52.    Relief from the Automatic Stay is premature in these early stages of the proceedings surrounding the TSA. Despite claims to the contrary, the Receiver has not shown that Advanta has breached the TSA by submitting the Tax Returns without electing the 2009 Five-Year Carryback. Further, and as discussed in detail above, there are no compelling reasons to grant the Motion and lift the Automatic Stay at this stage, given that the Receiver will not be prejudiced in any way should the various issues surrounding the TSA be finally resolved by the Court on the expedited schedule to which Advanta is prepared to agree. There are no looming deadlines, or in fact any deadlines whatsoever, relating to the IRS's review of the Tax Returns, nor is the Receiver subject to any deadline with respect to its filing of the Receiver Competing Returns. The deadline has already passed for making the elections relevant here. If, notwithstanding this, the Receiver were able to convince the IRS to accept different elections, the IRS would be accepting them late or, in effect, saying there is no deadline for the Receiver.[18] In either event, the Receiver would be unaffected by any deadline. On this basis alone, the Court should deny the Motion as premature.

### Conclusion

53.    Based upon the foregoing, Advanta submits that the relief requested in the Motion is not warranted by the facts, circumstances, or applicable law and the Motion should be denied. But in light of the concerns raised herein, if the Court grants the Motion, Advanta respectfully requests that the Court require the Receiver to include in its filing with the IRS of

---

[18] 26 U.S.C. § 301.6402-7(f) provides that the IRS, in its sole discretion, can adjust the common parent's properly-filed return or accept or adjust the competing return filed by the fiduciary. Accordingly, either the IRS requires that the Receiver's competing return has to have been timely filed, which is not possible since the filing deadline passed even before ABC was put into receivership, or the IRS determines that it is able to take the Receiver's competing return into account regardless of any filing deadline.

the Receiver Competing Returns a response to such filing prepared by Advanta so that the IRS

may consider Advanta's arguments in determining whether to accept the Receiver Competing

Returns.

WHEREFORE, Advanta respectfully requests that the Court deny the Motion in

all respects, and grant such other and further relief as it deems just and proper.

Dated: May 28, 2010
      Wilmington, Delaware

                                            _____
                                            Mark D. Collins (No. 2981)
                                            Paul N. Heath (No. 3704)
                                            Chun I. Jang (No. 4790)
                                            Zachary I. Shapiro (No. 5103)
                                            RICHARDS, LAYTON & FINGER, P.A.
                                            One Rodney Square
                                            920 North King Street
                                          Wilmington, Delaware 19801
                                          Telephone: (302) 651-7700
                                          Facsimile: (302) 651-7701

                                          - and -

                                          WEIL, GOTSHAL & MANGES LLP
                                          Marcia L. Goldstein
                                          Robert J. Lemons
                                          767 Fifth Avenue
                                          New York, NY 10153
                                          Telephone: (212) 310-8000
                                          Facsimile: (212) 310-8007

                                          ATTORNEYS FOR
                                          DEBTORS AND DEBTORS IN
                                          POSSESSION