| | |
|---|---|
| In re | Chapter 11 |
| ADVANTA CORP., *et al.,* | Case Nos. 09-13931 (KJC), *et seq.* |
| Debtors. | (jointly administered) |
| ADVANTA BANK CORP., | |
| Plaintiff, | |
| v. | Adversary Proc. No. 10-50795-KJC |
| ADVANTA CORP., | |
| Defendant. | |

**PRELIMINARY REPLY OF THE FEDERAL
DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF
ADVANTA BANK CORP., IN FURTHER SUPPORT OF ITS MOTION SEEKING A
DECLARATION THAT THE AUTOMATIC STAY DOES NOT APPLY OR, IN THE
ALTERNATIVE, AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 3

I.      ADVANTA WILL NOT BE PREJUDICED IF THE STAY IS LIFTED TO
PERMIT THE FILING OF THE FDIC-R RETURNS ...................................... 4

II.     THE FDIC-R WILL FACE SUBSTANTIAL HARDSHIP IF THE STAY IS NOT
LIFTED TO PERMIT THE FDIC-R TO FILE THE FDIC-R RETURNS .................... 11

        A.     The FDIC-R Has The Obligation and Right to File the FDIC-R Returns .......... 12

        B.     The FDIC-R Will Be Prejudiced If The FDIC-R Returns Are Not
Expeditiously Filed ............................................................................. 16

III.    THE FDIC-R IS LIKELY TO SUCCEED ON THE MERITS ....................................... 19

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*,
No. 03-11489 (KG), 2008 Bankr. LEXIS 1473 (Bankr. D. Del. May 5, 2008) ...............11

*CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.*,
110 F. Supp. 2d 259 (D. Del. 2000).....................................................................9

*Eames v. Nationwide Mut. Ins. Co.*,
412 F. Supp. 2d 431 (D. Del. 2006).....................................................................9

*Gen. Datacomm Indus. v. Arcara (In re Gen. Datacomm Indus.)*,
407 F.3d 616 (3d Cir. 2005)...............................................................................10

*Great Am. Ins. Co. v. Stephens*,
No. 04-3642, 2005 U.S. Dist. LEXIS 21382 (E.D. Pa. Sept. 27, 2005) ............................8

*Gunter v. Hutcheson*,
674 F.2d 862 (11th Cir. 1982) ...........................................................................18

*Holywell Corp v. Smith*,
503 U.S. 47 (1992)...........................................................................................12

*J.R. Simplot Co. v. Chevron Pipe Line Co.*,
No. 2:04CV00624DAK, 2006 U.S. Dist. LEXIS 70127
(D. Utah Sept. 27, 2006) ....................................................................................9

*Kapila v. United States (In re Taylor)*,
386 B.R. 361 (Bankr. S.D. Fla.), *aff'd*, 402 B.R. 56 (S.D. Fla. 2008)..............................19

*In re Rexene Prods. Co.*,
141 B.R. 574 (Bankr. D. Del. 1992) ....................................................................19

*United Dominion Indus. v. United States*,
532 U.S. 822 (2001)............................................................................................4

*United States v. Sims (In re Feiler)*,
218 F.3d 948 (9th Cir. 2000) ..............................................................................11

## STATE CASES

*Amirsaleh v. Bd. of Trade of N.Y., Inc.*,
No. 2822-CC, 2008 Del. Ch. LEXIS 131 (Del. Ch. Sept. 11, 2008) ................................10

*Amirsaleh v. Bd. of Trade of N.Y., Inc.*,
No. 2822-CC, 2009 Del. Ch. LEXIS 192 (Del. Ch. Nov. 9, 2009) ..................................10

*Baxter v. Saunders Outdoor Adver., Inc.*,
2007 UT App. 340, 171 P.3d 469 (Utah 2007).........................................................10, 11

*Markham v. Bradley*,
173 P.3d 865 (Utah 2007) ...............................................................................................10

*Nelson Dairies v. Royal*,
6 Pa. D. & C. 2d 371 (Pa. Com. Pl. 1956) ........................................................................7

## FEDERAL STATUTES, RULES & REGULATIONS

11 U.S.C. § 363(b) ...............................................................................................19, 20

26 U.S.C. § 172(b)(1)(H) ...........................................................................................16

26 U.S.C. § 172(b)(3) ...........................................................................................14, 15

26 U.S.C. § 6012(b)(3) ..........................................................................................12, 19

26 U.S.C. § 6402(k) .........................................................................................14, 15, 19

26 C.F.R. § 1.1502 .......................................................................................................14

26 C.F.R. § 1.1502-77.............................................................................................14, 15

26 C.F.R. § 1.1502-77(g) ............................................................................................15

26 C.F.R. § 1.1502-78.............................................................................................14, 15

26 C.F.R. § 301.6402-7 ...............................................................................................15

26 C.F.R. § 301.6402-7(b)(1) .....................................................................................13

26 C.F.R. § 301.6402-7(b)(3)(i)..................................................................................13

# TABLE OF AUTHORITIES
## (continued)

Page

26 C.F.R. § 301.6402-7(b)(5) ...............................................................13

26 C.F.R. § 301.6402-7(b)(6) ...............................................................13

26 C.F.R. § 301.6402-7(c) .......................................................................4

26 C.F.R. § 301.6402-7(e) .......................................................................4

26 C.F.R. § 301.6402-7(e)(1) ...............................................................13

26 C.F.R. § 301.6402-7(e)(3) ..........................................................13, 14

26 C.F.R. § 301.6402-7(e)(5) ............................................................4, 14

26 C.F.R. § 301.6402-7(g)(2)(iii) ......................................................4, 15

26 C.F.R. § 301.6402-7(g)(4) ..................................................................4

26 C.F.R. § 301.9100-1(b) ...................................................................16

26 C.F.R. § 301.9100-2(b) .............................................................16, 17

26 C.F.R. § 301.9100-2(c) ...................................................................17

Fed. R. Bankr. P. 7015 ............................................................................6

Fed. R. Bankr. P. 7056 ............................................................................5

Fed. R. Bankr. P. 7065 ............................................................................6

Fed. R. Civ. P. 15(b)(1) ..........................................................................6

Fed. R. Civ. P. 56(c)(1)(A) .....................................................................5

Fed. R. Civ. P. 65(a)(2) ..........................................................................6

Rev. Proc. 2009-52 ...............................................................................16

## MISCELLANEOUS

*Diesel Performance, Inc.*, T.C. Mem. 1999-302 (1999)........................................17

**TABLE OF AUTHORITIES**
(continued)

H.R. Rep. No. 100-795 (1988) (Conf. Report) ........................................................................14

IRS Publication 536 – Net Operating Losses (NOLs) for Individuals, Estates, and
  Trusts (2009) .....................................................................................................................17

## PRELIMINARY STATEMENT

1.       Advanta Corp. ("Advanta") has caught itself in a trap of its own making.   It admits that it conspired with the Official Committee of Unsecured Creditors (the "Committee") to take actions designed to harm one of Advanta's creditors, Advanta Bank Corp. ("ABC"), without providing ABC notice and an opportunity to be heard before this Court.   Now, Advanta and the Committee are trying desperately to "run out the clock" and prevent ABC's receiver, the Federal Deposit Insurance Corporation (the "FDIC-R"), from exercising its statutory rights to undo that wrong.   The Court should permit the FDIC-R to exercise its statutory authority to file the requested tax returns (the "FDIC-R Returns") without further delay so that the $54 million tax refund at issue is not forever lost to the detriment of both Advanta's and ABC's estates.

2.       The essential facts are undisputed.   On March 14, 2010, Advanta e-filed a 2009 consolidated tax return (the "2009 Consolidated Return") for Advanta and its affiliated group of corporations (the "Consolidated Group").

3.       The members of the Consolidated Group are parties to a Tax Sharing Agreement ("TSA").[1]   The TSA provides in pertinent part that each member of the Consolidated Group will not pay more, or suffer a greater loss, than the other members, that no member will pay an amount in excess of what it would have paid on a separate return, and that where a member is injured, that member will be compensated for its loss.

4.       This is made clear, among other places, in the fourth introductory "Whereas" clause of the TSA, which states in pertinent part that:

> [T]he filing of such consolidated returns shall be beneficial rather than
> disadvantageous to each Member company and that each Member company

---

[1] The TSA is attached to the Injunction Motion as Exhibit A and also to the Declaration of Richard L. Thompson, dated May 13, 2010, as Exhibit A.

should not with respect to any year, or part thereof, for which it is a Member of the Affiliated Group be required to pay more in lieu of taxes or receive a payment in lieu of a refund less than it would have paid or received if the Member company had at all times computed and paid its tax liability on a separate return basis.

5.     In its tax filing, Advanta elected to abandon an estimated $54 million tax refund (the "Refund") by failing to make a five-year NOL carryback election (the "Five-Year NOL Carryback").  Advanta now freely admits that it waived the Refund because, *under the TSA*, that $54 million refund plus another approximately $116 million would have belonged to ABC had the Refund been claimed.  (Declaration of Philip M. Browne In Support of Objection to Motion of Plaintiff Advanta Bank Corp. For Declaratory and Injunctive Relief in Connection With Its Amended Complaint ("Browne Decl") ¶ 9.)

6.     Advanta waived the Refund without giving ABC advanced notice and an opportunity to be heard because "Advanta believed there was no reason to delay the filing, and that any delay would simply increase the likelihood that ABC and/or the FDIC would take actions to the detriment of Advanta's estate and its creditors' interests."  (*Id.* ¶ 7.)  So Advanta – with the Committee by its side – stonewalled ABC, unilaterally stripped ABC of its due process rights, and filed the 2009 Consolidated Return with an election that violated the TSA.

7.     At that moment in time, the game changed and delay (rather than the decisive action leading up to the March 14 tax filing) became Advanta's friend.  With the 2009 Consolidated Return on file, Advanta and the Committee now audaciously proclaim that *they* would be deprived of their due process rights if the parties do not engage in extensive, expensive, and unnecessary discovery and a trial, which they propose occur between now and October 2010.  That proposal conveniently ignores that, even if the FDIC-R were to win at trial, it would likely be a pyrrhic victory because, pursuant to the Internal Revenue Code ("IRC") and the Treasury Department regulations promulgated thereunder, the FDIC-R must file the FDIC-R

Returns no later than September 15, 2010. Advanta's position also defies common-sense: the longer it takes for the FDIC-R to file the FDIC-R returns, the less likely it is that the IRS will exercise its discretion to honor those returns and the more likely it is that the Refund will be lost.

8.      This dispute is not nearly as complicated as Advanta and the Committee wish to make it. No amount of discovery (or expert testimony) can alter the applicable law, the *admittedly* unambiguous language of the TSA, or Advanta's other devastating admissions. Indeed, if Advanta and the Committee sincerely wanted to take discovery and have an evidentiary hearing, they had every opportunity to do so *before* they filed the Consolidated 2009 Return and inappropriately elected to forsake a $54 million refund. Instead, they chose to file first and permit others to ask questions later. In so doing, they violated the TSA and the Bankruptcy Code, and deliberately sought to foreclose ABC's legitimate rights under the IRC.

## ARGUMENT

9.      The purpose of the pending motions is simple – to prevent a $54 million tax refund from being lost to the detriment of Advanta's and ABC's estates. To facilitate the Court's expeditious resolution of those motions, the FDIC-R will assume *arguendo* (without conceding) that the filing of the FDIC-R Returns may have a conceivable impact on Advanta's estate.[2] The FDIC-R also agrees that, should it prevail on the motions and the Refund is in fact paid, the Refund should be placed in escrow, and any dispute over ownership of the Refund can

---

[2] Although the FDIC-R believes that it has a right to file the FDIC-R returns without seeking Court approval, in contrast to Advanta – which waived the Refund without Court approval and now asks this Court to "ratify" that maneuver after the fact – the FDIC-R is seeking advance permission from the Court to file the FDIC-R Returns out of an abundance of caution so that there can be no argument that the filing of those returns violates the bankruptcy stay. Accordingly, without making any admission and reserving all of its rights, the FDIC-R no longer seeks a ruling that the stay is inapplicable and will assume it is applicable for the purposes of this Motion. A revised proposed order granting the Motion is being submitted herewith.

be resolved at a later date.[3]   The first step in this litigation should be to protect the Refund.

Accordingly, the stay should be lifted to permit the FDIC-R to file the FDIC-R Returns.

## I.   ADVANTA WILL NOT BE PREJUDICED IF THE STAY IS LIFTED TO PERMIT THE FILING OF THE FDIC-R RETURNS

10.    In its Preliminary Objection ("Prelim. Objection"), Advanta correctly summarizes

the FDIC-R's argument for why lifting the stay will not prejudice Advanta's estate:

> The Receiver contends . . . that Advanta's estate will not be prejudiced by the lifting of the Automatic Stay because it alleges that ABC will have a claim in the amount of approximately $170 million against Advanta in all circumstances, and that Advanta is therefore better off if the Receiver files the [FDIC-R Returns] and is able to obtain an approximately $54 million refund that would either belong to Advanta or partially offset the approximately $170 million claim if it is paid to ABC.

(Prelim. Objection ¶ 34.)

11.    Advanta then feigns surprise, asserting that the FDIC-R argued "*for the first time*"

that Advanta had breached the TSA in the FDIC-R's reply brief in support of its Emergency

Motion For Declaratory and Injunctive Relief In Connection With Its Amended Complaint (the

---

[3] For now, it is sufficient to note that Advanta's bald assertion that the NOLs generated by ABC are property of Advanta's estate is incorrect, as Treas. Reg. § 301.6402-7(e)(5) clearly contemplates the divisibility of the NOLs of an affiliated group filing a consolidated return in this context.  Treas. Reg. §§ 301.6402-7(c) and (e) provide for an alternative agent to the common parent as far as a consolidated group is concerned and that a fiduciary of an insolvent financial institution may make independent choices with respect to tax attributes (including consolidated NOLs) to the extent attributable to the institution under its trusteeship.  The Supreme Court case cited by Advanta, *United Dominion Industries, Inc. v. United States*, 532 U.S. 822 (2001), for the proposition that Advanta is sole owner of the NOLs is inapposite.  In *United Dominion*, the Supreme Court addressed the treatment of a particular element of the consolidated NOL computation at a time when no express rule existed, and appropriately concluded that a single-entity approach should be the default rule.  By contrast, in the instant case, there are specific rules providing an exception to the normal single entity election procedures for a consolidated NOL carryback, as well as an exception to the normal rule that the common parent is the agent of the group for purposes of those procedures.  The determination of the refund amount (including the tentative carryback adjustment) payable to the fiduciary is made without regard to any agreements among group member and independent of whether the fiduciary is otherwise entitled to any portion of the refund or tentative carryback adjustment under applicable law.  *See* Treas. Reg. §§ 301.6402-7(g)(2)(iii), 301.6402-7(g)(4).   In addition, Treas. Reg. § 1.301-6402-7(g)(2)(iii) expressly gives priority to the losses of insolvent financial institutions over other group members for purposes of offsetting the group's taxable income in carryback years (thus generating larger potential refunds for the institution and its fiduciary than would arise under the normal carryback rules).  This provision reflects a deliberate and explicit policy choice to preserve fully the financial institution's separately incurred tax losses for the benefit of its creditors.  Advanta's procedural tactics in this case thus contravene both the FDIC-R's procedural rights under the regulations and its substantive right to full utilization of separate entity losses for the benefit of its creditors.

"Injunction Motion"). (Prelim. Objection ¶ 13.) However, the FDIC-R's argument should not have come as a shock to Advanta – it should have been obvious.

12. ABC attached the TSA as Exhibit A to the Injunction Motion. The intent of the TSA is unambiguously stated in the fourth Whereas clause:

> WHEREAS, it is the intention of the parties that if such consolidated returns are filed, each Member company should contribute its fair and equitable share to the taxes payable by the Affiliated Group or compensation for the reduction in the net operating loss deduction, capital loss deduction, or other tax benefit of the Affiliated Group resulting from the inclusion of the Member companies in the Affiliated Group, but that in any event, ***the filing of such consolidated returns shall be beneficial rather than disadvantageous to each Member company and that each Member company should not with respect to any year, or part thereof, for which it is a Member of the Affiliated Group be required to pay more in lieu of taxes or receive a payment in lieu of a refund less than it would have paid or received if the Member company had at all times computed and paid its tax liability on a separate return basis***. It is intended that this will comply with the pro rata method as described in SFAS 109 and its interpretation and all consideration of regulatory accounting principles.

(Emphasis added.) In other words, no Member company, such as ABC, can do worse by being part of a consolidated tax return than it would have if it had filed a separate return.

13. Advanta nonetheless nakedly asserts that complying with the letter and spirit of the Whereas clause "would lead to absurd results and would be impossible to administer." (Prelim. Objection ¶ 41.) Advanta then claims that the reference to SFAS 109 at the end of the Whereas clause somehow "mandate[s] that the parent's elections control." (*Id.*)

14. However, Advanta never explains the nature of the "expert testimony" it would introduce or how it could possibly override the plain language of the TSA or otherwise alter the outcome of the pending motions. (*Id.*) Simply put, Advanta is employing a delay tactic.[4]

---

[4] In another such tactic, Advanta asserts that the pending motions are not procedurally ripe. For example, Advanta alleges that the FDIC-R "has not moved for summary judgment about its rights under the TSA – because it cannot given that discovery has not yet commenced." That is false. Federal Rule of Civil Procedure 56(c)(1)(A), made applicable in this adversary proceeding by Fed. R. Bankr. P. 7056, provides that "a party may move for summary

(continued…)

15. No amount of expert testimony about GAAP can alter Advanta's admission that it breached the TSA. Advanta admits that, had it elected the Five-Year NOL Carryback, "Advanta would have exposed itself to an assertion by ABC under the TSA of a general unsecured claim of up to approximately $170 million." (Injunction Objection ¶ 33) (citing TSA §§ 1, 3(b)).)

16. That statement is absolutely correct. Section 1 of the TSA provides:

> In any year or part thereof in which it is planned that the Affiliated Group and any other affiliated subsidiaries of Advanta Corp . . . should file a consolidated tax return . . . on or before the date provided by law for payment of any federal or state tax or estimated federal or state tax by a Member, or as soon thereafter as the necessary computations have been completed (hereinafter called an "Adjustment Date") a computation shall be made of the accrued taxes or refund of tax properly reflected in the income statement, on a separate basis, that should be reflected under generally accepted accounting princip[le]s. The amount so computed is hereinafter referred to as the "Separate Member Tax" or the "Separate Member Refund," as the case may be.

17. As the Committee admits in its Preliminary Joinder ("Prelim. Joinder"), the next three sections of the TSA "impose payment obligations on the Affiliated Group":

> (i) Section 2 . . . obligates members to make payments to Advanta at the time the group's tax liability is due, (ii) Section 3 . . . obligates Advanta to make payments to members where a consolidated return creates a Separate Member Refund . . .; and (iii) Section 4 . . . obligates Advanta to pay members the amount of any tax savings realized by the taxable members of the Affiliated Group as a result of the use of any consolidated losses attributable to a loss member at the time such savings are realized (if not otherwise compensated).

---

judgment *at any time until 30 days after the close of discovery*." (Emphasis added.) Indeed, summary judgment motions are routinely made prior to discovery when the material facts are undisputed, as they are here, and the FDIC-R has no objection to the Court's conversion of the pending motions to summary judgment motions. In addition, Federal Rule of Civil Procedure 65(a)(2), made applicable to this adversary proceeding through Fed. R. Bankr. 7065, provides that "[b]efore or after the hearing on a motion for a preliminary injunction the Court may advance the trial on the merits and consolidate it with the hearing." Thus, the Court is plainly empowered to interpret the TSA in connection with the Injunction Motion. Advanta also asserts that FDIC-R has "failed to place before the Court its claims under the TSA." (Prelim. Objection ¶ 4.) The pending motions now put those claims squarely before the Court and, to the extent the pleadings must be amended, that can easily be remedied and is no cause for further delay. Indeed, under Federal Rule of Civil Procedure 15(b)(1), as incorporated by Fed. R. Bankr. P. 7015, pleadings can even be amended at trial to conform with the evidence. In short, *Advanta* put the interpretation of the TSA at issue by asserting that its rationale for denying ABC the Refund was justified by the TSA. Advanta should not be permitted to raise procedural roadblocks to prevent the Court from interpreting the TSA to the extent necessary to decide the pending motions.

(Prelim. Joinder ¶ 37.)

18.     Section 3(b) of the TSA, which Advanta cites in its Injunction Objection as the source of its payment obligation to ABC based on the Five-Year NOL Carryback, states:

> If on any Adjustment Date there is a Separate Member Refund and the Affiliated Group also is entitled to a refund, but such refund is less than the Separate Member refund, Advanta Corp. shall pay to such Member payment in an amount equal to the Separate Member Refund, together with an allocable share of any interest promptly upon receipt of payment from the taxing authority.

19.     Thus, as Mr. Browne states in his Declaration:

> Had Advanta elected to carry back the 2009 NOL five years, the group would have been entitled to a tax refund of approximately $54 million (the "**_Refund_**"). However, by making such election, Advanta likely would have exposed itself to a general unsecured claim by ABC under the TSA of approximately $170 million. The amount of up to approximately $170 million is based upon the hypothetical tax refund ABC would have been entitled to if it had filed separate returns and an election to carry back the 2009 tax loss for five years was in effect.

(Browne Decl. ¶ 9.)

20.     As Advanta and the Committee admit, had Advanta not waived the Refund, it would have belonged to ABC under the TSA.  The obvious flip side of Advanta's admission is that, by waiving the Refund, Advanta left ABC worse off for participating in the group return than ABC would have been had it filed a separate return.  Advanta thus violated both the words and spirit of the TSA.

21.     Advanta seeks to escape this conclusion by arguing that the fourth Whereas clause is "not an operative provision" of the TSA, relying on _Nelson Dairies v. Royal_, 6 Pa. D. & C.2d 371 (Pa. Com. Pl. 1956).  (Prelim. Objection ¶ 38.)  In _Nelson Dairies_, the court refused to apply a whereas clause to override contract provisions with which it was inconsistent, because doing so would be "a radical departure from the plain language of the operative clauses of the contract" and would "unduly warp[] and twist[] the meaning of the plain language."  _Id._ at 374.

22.     By contrast, where (as here) there is no such conflict, whereas clauses are given their full effect.  *See, e.g.*, *Great Am. Ins. Co. v. Stephens*, No. 04-3642, 2005 U.S. Dist. LEXIS 21382 (E.D. Pa. Sept. 27, 2005).  In *Great American Insurance*, the court reasoned that "general rules of contract construction advise against making any provisions of an agreement meaningless or superfluous, if the terms can be reconciled to avoid such an outcome."  *Id.* at *16.  Because the whereas clause was reconcilable with the other provision at issue, the court gave effect to both provisions.  *Id.* at *16-17.

23.     Here, as in *Great American Insurance*, there is no conflict between the fourth Whereas clause and the rest of the TSA.  Indeed, the fourth Whereas clause is entirely consistent with the remainder of the TSA.[5]

24.     As discussed above, Paragraph 3(b) of the TSA provides:

> If on any Adjustment Date there is a Separate Member Refund and the Affiliated Group also is ***entitled to a refund***, but such refund is less than the Separate Member refund, Advanta Corp. shall pay to such Member payment in an amount equal to the Separate Member Refund, together with an allocable share of any interest promptly upon receipt of payment from the taxing authority.

(Emphasis added.)

25.     When read in light of the fourth Whereas clause, paragraph 3(b) plainly means that, if the Affiliated Group is "entitled to a refund" that is less than the Separate Member Refund to which ABC would be entitled if it calculated its taxes separately, then ABC is entitled to the Separate Member Refund.  Notably, the words "entitled to a refund" do not imply that Advanta must have *claimed* the refund.  As Advanta admits, the Affiliated Group was "entitled

---

[5] Advanta questions why the other members of the Consolidated Group would agree to a provision requiring that decisions be made to benefit ABC.  (Prelim. Objection ¶ 40.)  However this argument ignores that the TSA was intended to benefit *all* members, not just ABC specifically.  The members would presumably agree – and did agree – to a contract that protects each of them.

to a refund" for the 2009 taxable year. (Browne Decl. ¶ 9.) However, Advanta waived the Refund, thus depriving ABC of the benefit of the bargain.

26. Advanta also breached paragraph 2(a) of the TSA, which states:

> If on any Adjustment Date there is a Separate Member Tax and the tax payment then due from the Affiliated Group is in excess of the amount of the Separate Member Tax, then the Member shall pay to Advanta Corp. an amount equal to the Separate Member Tax. No member shall pay to Advanta Corp. an amount in excess of the amount which would have been payable on a separate company basis.

27. It is black letter law[6] that a contract's words must be accorded their plain meaning.[7] The definitions of "pay" include "to discharge indebtedness for," "to make a disposal or transfer of (money)," "to give or forfeit in expiation or retribution," "to make compensation for," "to requite according to what is deserved," and "to return value or profit to." *Webster's Online Dictionary*. "Payment" is defined as "the act of paying." *Id.*

28. Read in light of the fourth Whereas clause and common sense, it is hard to imagine how Advanta's waiver of the Refund cannot be equated with ABC "paying" more to Advanta than ABC otherwise would have paid. Because Advanta waived the Refund, ABC paid $54 million more in taxes (through Advanta) than ABC would have paid had it separately filed.

---

[6] The TSA does not contain a choice of law provision. The two most logical choices of law are Delaware (because Advanta is a Delaware corporation) and Utah (because ABC is a Utah bank). Because Delaware and Utah law are sufficiently similar on the issues pertinent to the pending motions, this Court need not resolve the choice of law issue and the FDIC-R will cite to authority from both jurisdictions.

[7] *See, e.g.*, *Eames v. Nationwide Mut. Ins. Co.*, 412 F. Supp. 2d 431, 435-436 (D. Del. 2006) ("Clear and unambiguous language in [a contract] should be given its ordinary and usual meaning. [] And if the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them. . . . Extrinsic evidence is not to be used to interpret contract language where that language is plain and clear on its face.") (internal citations and quotations omitted); *CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.*, 110 F. Supp. 2d 259, 265-66 (D. Del. 2000) (finding that, after analyzing dictionary definitions of the terms "amount of loss" and "loss," the plain and common meaning of the terms must apply and "[t]he Court cannot add that which is already included in the plain meaning of these terms. . . . Accordingly, the Court's interpretation of these terms merely effectuates their plain and ordinary meaning as they are used in the context of insurance."); *J.R. Simplot Co. v. Chevron Pipe Line Co.*, No. 2:04CV00624DAK, 2006 U.S. Dist. LEXIS 70127, at *20 (D. Utah Sept. 27, 2006) ("Words used in a contract will be given their ordinary, plain or natural meaning unless the words have acquired a peculiar meaning or absurd consequences would result from doing so.").

29.     Advanta and the Committee's argument that Advanta can avoid its obligations under the TSA by not claiming the Refund ignores not only the TSA's plain language, but also the duty of good faith and fair dealing.  That duty is implied in every contract and is intended to protect the spirit of a contract and the reasonable expectations of the parties.  *See Amirsaleh v Bd. of Trade of N.Y., Inc.*, No. 2822-CC, 2009 Del. Ch. LEXIS 192, at *13 (Del. Ch. Nov. 9, 2009) ("the implied covenant is 'best understood' as a judicial tool used to imply terms in a contract that protect the reasonable expectations of the parties to (or beneficiaries of) the contract"); *Markham v. Bradley*, 173 P.3d 865, 871 (Utah 2007) ("Under [the covenant], both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract.").

30.     The duty applies even where the contract gives one or both of the parties discretion in its execution.  *See Amirsaleh v. Bd. of Trade of N.Y.*, No. 2822-CC, 2008 Del. Ch. LEXIS 131, at *30 (Del. Ch. Sept. 11, 2008) ("[T]he implied covenant [of good faith and fair dealing] 'is particularly important . . . in contracts that defer a decision at the time of contracting and empower one party to make that decision later'"); *Markham*, 173 P.3d at 872 ("even where a contract expressly provides a privilege to one party, the exercise of that right is subject to the covenant of good faith and fair dealing") (citation omitted).

31.     Critically, the duty of good faith and fair dealing also prevents a party to a contract from frustrating the contract's purpose by preventing the occurrence of a condition precedent.  *See Gen. Datacomm Indus. v. Arcara (In re Gen. Datacomm Indus.)*, 407 F.3d 616, 622 (3d Cir. 2005) (refusing to excuse party from contractual obligation where party prevented condition precedent from occurring) (citation omitted); *Baxter v. Saunders Outdoor Adver., Inc.*,

171 P.3d 469, 472-73 (Utah 2007) (holding that party to a contract "was required to reasonably and in good faith attempt to fulfill that condition").

32.     Here, Advanta admits that, by waiving the Refund, it prevented the occurrence of a condition precedent to Advanta's payment obligations to ABC.  As Advanta states:

> A refund would only have become due if the 2009 Five-Year Carryback election was made.  Accordingly, any claim arising from a refund **was contingent**.  The failure of a contingency to occur is not a payment to Advanta as contemplated by Paragraph 2(a).

(Prelim. Objection ¶ 36 n.11) (emphasis added).  However, Advanta's failure to elect the 2009 Five-Year Carryback cannot unilaterally transform a payment obligation into a contingent obligation merely because Advanta, in bad faith, refused to claim a refund in an amount that was owed to ABC under the TSA.

33.     The stated purpose of the TSA is to benefit all Members through the filing of a consolidated tax return.  ABC reasonably expected that it would benefit from the arrangement. Instead, Advanta prevented ABC from receiving that benefit by not electing the 2009 Five-Year NOL Carryback and waiving the Refund.  In so doing, Advanta breached the TSA.[8]

## II.     THE FDIC-R WILL FACE SUBSTANTIAL HARDSHIP IF THE STAY IS NOT LIFTED TO PERMIT THE FDIC-R TO FILE THE FDIC-R RETURNS

34.     Advanta and the Committee make two arguments for why the FDIC-R would not be prejudiced by delay.  First, they contend that the FDIC-R has neither the obligation nor the

---

[8] For similar reasons, the waiver of the Refund was by definition at minimum a constructive fraudulent transfer.  It is well-settled that, when a debtor elects to waive a carryback of an NOL, and "relinquish [its] right to an immediate tax refund in exchange for future tax considerations, a transfer has occurred."  *United States v. Sims (In re Feiler)*, 218 F.3d 948, 956 (9th Cir. 2000); *see also Kapila v. United States (In re Taylor)*, 386 B.R. 361 (Bankr. S.D. Fla.), *aff'd*, 402 B.R. 56 (S.D. Fla. 2008).  Advanta's waiver of the Refund for little or no benefit in return thus amounts to (i) a transfer, (ii) made without receiving reasonably equivalent value in exchange, (iii) while Advanta was insolvent.  *Brandt v. Trivest II, Inc. (In re Plassein Int'l. Corp.)*, No. 03-11489 (KG), 2008 Bankr. LEXIS 1473, at *17 (Bankr. D. Del. May 5, 2008).  As stated in ABC's proof of claim, the FDIC-R also has other claims against Advanta that need not be adjudicated at this time and may never have to be adjudicated if the pending motions are granted and the Refund is paid.

right to file the FDIC-R Returns. (Prelim. Objection ¶¶ 47-51; Prelim. Joinder ¶¶ 20-24.) Second, they assert that granting relief from the automatic stay would be "premature" purportedly because "[t]here are no looming deadlines, or in fact any deadlines whatsoever, relating to the IRS's review of the Tax Returns, nor is the Receiver subject to any deadline with respect to its filing of the [FDIC-R Returns]." (Prelim. Objection ¶ 52; *see also* Prelim. Joinder ¶ 51.) Both arguments are based on a misreading of the law and a blindness to reality.

### A.     The FDIC-R Has The Obligation and Right to File the FDIC-R Returns

35.     Advanta and the Committee contend that the FDIC-R lacks the authority to file the FDIC-R Returns because ABC was not under receivership when Advanta filed the 2009 Consolidated Return on March 14, 2009. Even though the FDIC-R was named receiver a mere five days later, Advanta and the Committee assert that the waiver of the Refund is now "statutorily irrevocable." (Prelim. Joinder ¶ 52.) That position is plainly wrong. As a statutory "fiduciary" of ABC, the FDIC-R is not only permitted to, but is required to file an FDIC-R Return because the 2009 Consolidated Return filed by Advanta prejudices ABC.

36.     Section 6012(b)(3) of the IRC provides in pertinent part that the FDIC-R, as receiver of ABC, "shall make the return of income for [ABC] in the same manner and form as corporations are required to make such returns." However, Section 6012(b)(3) does not merely indicate the "manner" and "form" in which a fiduciary to the assets or business of a defunct corporation should file. Rather, as the Supreme Court held in *Holywell Corp v. Smith*, 503 U.S. 47, 52 (1992), "the trustee must pay the tax due on the income attributable to the corporate debtors' property because § 6012(b)(3) *requires* him to make a return as the 'assignee' of the 'property . . . of a corporation.'" (Emphasis added.)

37.     Advanta's filing of the 2009 Consolidated Return does not discharge the FDIC-R's obligations under Section 6012(b)(3), particularly if the FDIC-R disagrees with the return

filed.  Likewise, Advanta's statement that it "would create havoc in the tax system" (Prelim. Objection ¶ 49) if the FDIC-R is permitted to file FDIC-R Returns for a period that pre-dates the FDIC-R's appointment as receiver is false.

38.     For the purposes of the IRC, the FDIC-R is deemed a "fiduciary" of ABC.  26 C.F.R. § 301.6402-7(b)(3)(i).  A fiduciary may file a "loss year" return with respect to the "loss year group" in conjunction with the filing of a claim for refund.  26 C.F.R. §§ 301.6402-7(e)(1) and (3).  A loss year is a taxable year for which any member or former member of the carryback year group claims a loss that may be carried back.  *See* 26 C.F.R. § 301.6402-7(b)(5).  The 2009 taxable year is thus a "loss year" with respect to ABC.

39.     A loss year group is "a consolidated group of which a corporation ***that is or becomes an insolvent financial institution*** is a member during a loss year."  26 C.F.R. § 301.6402-7(b)(6) (emphasis added).  A carryback year group is "a consolidated group of which a corporation ***that is or becomes an insolvent financial institution*** is a member during a consolidated carryback year."  26 C.F.R. § 301.6402-7(b)(1) (emphasis added).  The "or becomes" language of the regulations thus contemplates the FDIC's "late" arrival to the tax processes of the consolidated return group.

40.     Treasury regulations also provide in relevant part that the "fiduciary" may choose to exercise its agency if it does not accept the loss year return or refund claim "filed by the common parent," which clearly connotes the FDIC-R acting *after* a return or claim has been filed by the common parent.  In relevant part, Treas. Reg. § 301.6402-7(e)(1) provides that "***[i]f . . . the fiduciary does not accept a claim for refund filed by the common parent***, the fiduciary may claim a refund under this section by filing its own claim for refund under section 6402."  *See also* Treas. Reg. § 301.6402-7(e)(3) ("If the institution is a member of a loss year group, and

either the common parent does not file a loss year return *or **the fiduciary does not accept the loss year return filed by the common parent***, the fiduciary may file a loss year return with respect to the loss year group.  A loss year return can only be filed by the fiduciary in conjunction with the filing of a claim for refund under paragraph (e)(1).") (emphasis added).

41.     Congress and the Treasury Department thus specifically granted the FDIC-R authority *to override* the authority vested in the common parent of a consolidated group to file returns pursuant to Treas. Reg. §  1.1502, and particularly Treas. Reg. § 1.1502-77 (Agent for the Group) and Treas. Reg. § 1.1502-78 (Tentative Carryback Adjustments).

42.     Indeed, the legislative history of IRC Section 6402(k) demonstrates that it was enacted specifically to overcome the difficulties that a statutory or court-appointed receiver (or similar fiduciary of a consolidated group member) may experience in obtaining tax refunds attributable to that member's losses as a result of actions taken by the common parent.  The Conference Report provides in relevant part as follows:

> The Secretary of the Treasury is authorized to provide access to tax refunds to a statutory or court appointed fiduciary of an insolvent member of a group of corporations filing a consolidated tax return, to the extent the Secretary determines that the refund is properly attributable to the losses of such insolvent member and that such access is consistent with the purposes [of] the consolidated return provisions.  It is also intended that the Secretary may authorize participation by such fiduciary in the controversy and refund procedure.

H.R. Rep. No. 100-795, at 604 (1988) (Conf. Rep.).

43.     The IRC and the regulations promulgated thereunder not only provide the fiduciary access to tax refunds of an insolvent member of a consolidated group, but also ensure that such access is meaningful.  For example, Treas. Reg. § 301.6402-7(e)(5) provides that any election filed by the common parent of a loss year group under IRC Section 172(b)(3) to relinquish the entire carryback period with respect to a consolidated NOL arising in a loss year is

*not effective* with respect to the portion of the consolidated NOL attributable to a subsidiary that is an insolvent financial institution. Instead, the fiduciary has authority to make the election under Section 172(b)(3) with respect to the portion of the NOL attributable to the institution.

44. In addition, the common parent agency regulations themselves state that "[f]or further rules applicable to groups that include insolvent financial institutions, see § 301.6402-7 of this chapter." 26 C.F.R. §§ 1.1502-77(g) and 1.1502-78(b)(3). The placement of these cross references at the end of Sections 1.1502-77 and 1.1502-78 indicate that the rules under Section 301.6402-7 are intended to modify all of the common parent agency provisions. Accordingly, Section 6402(k) of the IRC and Treas. Reg. § 301.6402-7 are clearly intended to override the common parent agency provisions of Treas. Regs. §§ 1.1502-77 and 1.1502-78.[9]

45. Yet, by Advanta's and the Committee's logic, all the common parent has to do to void all of the fiduciary's rights under Treas. Reg. § 301.6402-7 is file a timely return at the first possible moment (just after midnight on December 31st). That position runs directly contrary to the statutory and regulatory provisions cited above, as even Advanta begrudgingly admits in a footnote. (Prelim. Objection ¶ 26 n.10) ("26 C.F.R. § 301.6402-7, which the Receiver also cites in support of its contention, merely ***permits a fiduciary to file a competing tax return***, but does not obligate it to do so.") (emphasis added).

46. In short, Advanta's filing of the 2009 Consolidated Return on March 14, 2009, does not render Advanta's improper waiver of the Refund "irrevocable." The Motion should be granted so that immediate corrective action can be taken by the FDIC-R.

---

[9] Moreover, Treas. Reg. § 1.301.6402-7(g)(2)(iii) provides additional substantive rights to the receiver with respect to the carryback of ABC's losses. *See* Footnote 3, *supra*.

**B.  The FDIC-R Will Be Prejudiced If The FDIC-R Returns Are Not Expeditiously Filed**

47.     Although Advanta's waiver of the Refund is not yet "irrevocable," it could become "irrevocable" if Advanta and the Committee are permitted to delay these proceedings as they propose.  Advanta is simply wrong in its assertion that "[t]here are no looming deadlines, or in fact any deadlines whatsoever, relating to the IRS's review of the Tax Returns, nor is the Receiver subject to any deadline with respect to its filing of the Receiver Competing Returns."  (Prelim. Objection ¶ 52.)

48.     The regulations issued under Section 6402 of the IRC do not specify the time frame within which the FDIC-R must file an alternative loss year return or a refund claim on behalf of an insolvent financial institution.  However, the five-year carryback election is subject to its own rules.  Pursuant to Section 172(b)(1)(H)(iii) of the IRC and Rev. Proc. 2009-52, a taxpayer (including a consolidated group) may make the five-year carryback election by attaching a statement to its return (which may be an amended return) for the taxable year in which the "applicable NOL" arises.  The return and statement must be filed on or before the due date (including extensions) of the return for the taxpayer's last taxable year beginning in 2009.

49.     Advanta's Consolidated 2009 Return was due on March 15, 2010.  However, Treasury Regulation Section 301.9100-2(b) provides for an automatic six-month extension from the due date of a return excluding extensions for the making of a "statutory election" whose due dates are the due date of the return or the due date of the return including extensions.[10]  To be entitled to this extension, the taxpayer must have timely filed its return for the year the election

---

[10] An election includes an application for relief in respect of tax and a "statutory election" means an election whose due date is prescribed by statute and should include the election contemplated in Section 172(b)(1)(H) of the IRC. *See* 26 C.F.R. § 301.9100-1(b).

should have been made *and* the taxpayer must take "corrective action" pursuant to the regulations *within that six-month extension period*. 26 C.F.R. § 301.9100-2(b).[11]

50.    Further support for this interpretation of the statute and regulations is found in IRS Publication 536 – Net Operating Losses (NOLs) for Individuals, Estates, and Trusts for use in preparing 2009 returns. The section dealing with special rules for 2008 or 2009 NOLs states:

> An election to apply a 3, 4, or five-year carryback period must be filed by the due date (including extensions) for filing your 2009 return. If you filed your return on time without making the election, you can still make the election on an amended return filed within 6 months of the due date of the return (excluding extensions) by attaching the election to the amended return, and writing "Filed pursuant to section 301.9100-2" on the election statement.

51.    Based on the above, the FDIC-R has no later than September 15, 2010 to elect the application of the five-year carryback rule with respect to the 2009 NOLs attributable to ABC.

52.    Of course, the sooner the FDIC-R files the FDIC-R Returns, the more likely it is that the IRS will honor the FDIC-R Returns rather than the original elections in the Consolidated 2009 Return filed by Advanta.[12] As Advanta and the Committee concede, "the IRS has discretion not to accept the competing returns." (Prelim. Objection ¶ 50; *see also* Prelim. Joinder ¶ 24 ("[T]he IRS would not be obligated to accept [the FDIC-R Returns].").) Common sense dictates that, once the IRS processes the Consolidated 2009 Return, it will be less likely to reopen its consideration of that return if and when the FDIC-R Return is filed. A prompt decision is also important given the possibility of an appeal by Advanta in the event the motions are granted as a further attempt to frustrate the FDIC-R's right to file the FDIC-R Returns.

---

[11] "Corrective action" means taking the steps required to file the election in accordance with the statute or the regulation published in the Federal Register, or the revenue ruling, revenue procedure, notice, or announcement published in the Internal Revenue Bulletin and complying with all other requirements. *See* 26 C.F.R. § 301.9100-2(c); *see also Diesel Performance, Inc.*, T.C. Mem. 1999-302 (1999).

[12] The urgency of a prompt decision on the pending motions is underscored by the possibility of an appeal by Advanta in the event the motions are granted as a further attempt to frustrate the FDIC-R's right to file the FDIC-R Returns.

53.     Finally, there will be substantial prejudice to the FDIC-R if the Refund is lost. Although purporting to act in the interests of Advanta's "'Mom and Pop' creditors" (Prelim Joinder ¶ 3),[13] Advanta and the Committee ignore the millions of "Moms and Pops" on the other side of the v. in this case – the American taxpayer.  Congress created the FDIC to maintain the stability of and public confidence in the nation's banking system, by, among other things, insuring the deposits of banking institutions and managing the receivership of failed banking institutions.  *See* http://www.fdic.gov/about/mission/index.html; *Gunter v. Hutcheson*, 674 F.2d 862, 870 (11th Cir. 1982).  The FDIC is currently responding to one of the worst crises in the history of the national banking system.  In the last two years, 229 banks failed in the United States:  25 in 2008, 140 in 2009, and already 72 more as of May 14, 2010.  By way of contrast, only 27 banks failed during the entire period between October 1, 2000 and January 1, 2008.  *See* http://www.fdic.gov/bank/individual/failed/banklist.html.  The FDIC serves as insurer and receiver for each and every one of these failed banks.

54.     This is not "one arm of the federal government . . . playing a zero sum game in pursuing funds from the government's own general treasury in order to create a new and massive claims against the estates."  (Prelim. Joinder ¶ 1.)  As the Committee notes, the FDIC-R has already paid ABC's depositors out of the Federal Deposit Insurance Fund.  (*Id.* ¶ 1 n.2.)  The FDIC estimates that the cost of ABC's failure to the taxpayer is approximately *$635.6 million*. *See* http://www.fdic.gov/news/news/press/ 2010/pr10058.html.

---

[13] According to Schedule F – Unsecured Creditors Holding Unsecured NonPriority Claims filed by Advanta, a total of $226,565,459.94 claims were scheduled.  Many of the claims are insider claims, including those of Messrs. Rosoff and Browne, and are listed in an undetermined amount.  Of the approximately $226 million scheduled, just over $225 million represent two claims: (1) a claim by The Bank of New York Mellon, representing the senior bond holders, with claims of approximately $133 million, and (2) a claim by the Law Debenture Trust, representing the junior bondholders, in the amount of $92.29 million.  The Committee of Unsecured Creditors consists of those two financial institutions, plus Stonehill Capital Management, LLC (a real estate management company), Brandywine Operating Partnership (also a real estate management company), and DVL Incorporated (a heating, ventilation, and air conditioning company) – hardly "Moms and Pops."

55.     If Advanta is permitted to take ABC's NOLs, preserve its basis in ABC, and claim a worthless stock deduction, the federal government would in effect have made *two* payments – one to ABC's depositors and one to Advanta's creditors.  Advanta is not entitled to its own special government bail out at the expense of the taxpayer.

## III.     THE FDIC-R IS LIKELY TO SUCCEED ON THE MERITS

56.     Advanta and the Committee do not – because they cannot – contest that the FDIC-R need only make a "very slight" showing that the IRS is likely to accept the FDIC-R Returns.  *In re Rexene Prods. Co.*, 141 B.R. 574, 578 (Bankr. D. Del. 1992).  Instead, they reprise their argument that "any amended consolidated return filed at this point would be late, the elections made by Advanta are statutorily irrevocable, and accordingly the IRS may reject the FDIC-R's attempt at reversal."  (Prelim. Joinder ¶ 52; *see also* Prelim. Objection ¶¶ 50, 52.) As discussed above, those arguments fail.

57.     Sections 6012(3)(b) and 6402(k) of the IRC and the applicable Treasury regulations clearly permit the FDIC-R to file an FDIC-R Return before September 15, 2010, and claim and receive tax refunds with respect to the NOLs attributable to ABC.  ABC's contribution to the NOLs of the Consolidated Group in the 2009 taxable year are admitted by Advanta. (Browne Decl. ¶ 9.)  Thus, it is very likely that the IRS will honor the FDIC-R Returns.

58.     The FDIC-R's likelihood of success increases even further if the Court also grants the Injunction Motion, which seeks a declaration that Advanta's original tax election in its 2009 Consolidated Return is void *ab initio* as violating Section 363(b) of the Bankruptcy Code. Although the IRS may not be bound by such a ruling, one can only assume that receiving notice of a Court order voiding the elections in the 2009 Consolidated Return together with the FDIC-R Returns replacing those voided elections will result in the IRS looking more favorably upon the

FDIC-R Returns.[14]  Indeed, Advanta has specifically stated that, if the Court agrees that the FDIC-R "has an approximately $170 million claim against Advanta under the TSA, Advanta would likely support the Receiver's filing of [the FDIC-R returns], *and would work with the Receiver to seek payment of the refund from the IRS*."  (Prelim. Objection ¶ 6) (emphasis added).

59.     In the final analysis, Advanta and the Committee protest too much.  If Advanta's waiver of the Refund is truly "irrevocable," and the IRS will have little choice but to "reject" the FDIC-R Returns, then there is presumably no harm to Advanta or its other creditors if the FDIC-R files those returns.  Of course, if that were true, then Advanta and the Committee presumably would not be fighting the FDIC-R's motions as hard as they are.

60.     They are fighting because they painted themselves into a corner by filing the 2009 Consolidated Return without seeking prior Court approval as required by Section 363(b) of the Bankruptcy Code.  The FDIC-R has a statutory duty to right that wrong.  The FDIC-R more than meets the minimal standard for likelihood of success.  The Motion should be granted.

## CONCLUSION

61.     The FDIC-R's filing of the FDIC-R Returns will cause no undue harm or prejudice to Advanta's estate, as the filing of the FDIC-R Returns merely preserves the FDIC-R's rights in accordance with its statutory and fiduciary duties as Receiver of ABC.  As a result, to the extent that it is deemed to apply and may be required, the automatic stay should be lifted so that the FDIC-R may proceed with the filing of the FDIC-R Returns.

---

[14] Advanta requests that, if the Motion is granted, "the Court require the Receiver to include in its filing with the IRS of the [FDIC-R Returns] a response to such filing prepared by Advanta so that the IRS may consider Advanta's arguments in determining whether to accept the [FDIC-Returns]."  (Prelim. Objection ¶ 53.)  The FDIC-R believes that the Court's decision(s) on the pending motions will speak for themselves and will agree to submit those decisions with the FDIC-R Returns should the Court permit the filing of those returns.

WHEREFORE, the FDIC-R respectfully requests that this Court enter an Order (i) holding that, to the extent that the automatic stay applies, it is lifted so that the FDIC-R as fiduciary of ABC file FDIC-R Returns for the 2008 and 2009 taxable years of the Consolidated Group, and any amendments to prior year's returns as may be permitted under law and, (ii) granting such other and further relief as this Court may deem just and proper.

Dated: June 3, 2010
      Wilmington, Delaware

Respectfully submitted,

PINCKNEY, HARRIS & WEIDINGER, LLC


 **/s/ Adam Hiller**
Adam Hiller (DE No. 4105)
Donna Harris (DE No. 3740)
1220 North Market Street, Suite 950
Wilmington, Delaware 19801
(302) 504-1497 telephone
(302) 442-7046 facsimile
*ahiller@phw-law.com*

-and-

Geoffrey T. Raicht, Esquire
Andrew B. Kratenstein, Esquire
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173
(212) 547-5679 telephone
(212) 547-5444 facsimile
*graicht@mwe.com*
*akratenstein@mwe.com*

-and-

Kathryn R. Norcross (of counsel)
Senior Counsel
Dennis J. Early (of counsel)
Counsel-Legal Division
Federal Deposit Insurance Corporation
Legal Division
3501 Fairfax Drive, VS-D-
Arlington, VA  22226
(703) 562-2783
Email: knorcross@fdic.gov
Email: dearly@fdic.gov

*Counsel for the Federal Deposit Insurance
Corporation, in its Capacity as Receiver*