IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>ADVANTA CORP., *et al.,*<br><br>                Debtors. | Chapter 11<br><br>Case Nos. 09-13931 (KJC), *et seq.*<br>(jointly administered) |
| ADVANTA BANK CORP.,<br><br>                Plaintiff,<br><br>v.<br><br>ADVANTA CORP.,<br><br>                Defendant. | Adversary Proc. No. 10-50795-KJC |

**PRE-HEARING BRIEF OF THE FEDERAL DEPOSIT
INSURANCE CORPORATION, AS RECEIVER OF ADVANTA BANK CORP.**

**(Hearing Scheduled for August 16-18, 2010)**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 4

I.     ADVANTA AND ABC .............................................................................. 4

II.    THE TAX SHARING AGREEMENT .................................................... 5

III.   THE 2009 TAX ELECTIONS ................................................................ 6

IV.   ABC IS CLOSED AND THE FDIC IS APPOINTED AS RECEIVER ................... 9

ARGUMENT ....................................................................................................................... 10

I.     THE LIFT STAY MOTION SHOULD BE GRANTED ........................ 10

    A.    The FDIC-R Has the Right to File the FDIC-R Returns .............................. 10

    B.    Advanta Will Not Be Prejudiced if the FDIC-R Files the FDIC-R Returns ................................................................................................. 13

        1.   ABC is Entitled to a $170 Million Separate Member Refund .......... 13

        2.   Advanta's GAAP Argument Fails .................................................... 14

        3.   Advanta Also Breached the Duty of Good Faith and Fair Dealing ............................................................................................ 17

        4.   Advanta Breached Its Fiduciary Duties to ABC .............................. 18

        5.   Any Alleged Benefit of the 2009 NOLs Going Forward is Speculative ..................................................................................... 19

    C.    The FDIC-R Will Face Substantial Hardship if it is Not Permitted to File the FDIC-R Returns .............................................................. 21

    D.    The IRS is Likely to Honor the FDIC-R Returns ......................................... 21

    E.    The FDIC-R Returns Must be Filed by September 15, 2010 ....................... 21

II.    THE INJUNCTION MOTION SHOULD BE GRANTED ..................... 23

    A.    Advanta's Tax Elections Were Not Ordinary Course Transactions ............. 23

    B.    The Tax Elections Are Void Ab Initio ......................................................... 24

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

**PAGE**

*Baumgart v. Nat'l City Bank (In re Wright Airlines, Inc.)*,
    88 B.R. 146 (Bankr. N.D. Ohio 1988) ....................................................................23

*Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*,
    No. 03-11489 (KG), 2008 Bankr. LEXIS 1473 (Bankr. D. Del. May 5, 2008) ......................18

*Federal Deposit Ins. Corp. v. Goldberg*,
    906 F.2d 1087 (5th Cir. 1990) ......................................................................24

*In re Federal-Mogul Global*,
    402 B.R. 625 (D. Del. 2009) .........................................................................10

*Fernwood Markets v. Title Ins. Co.*,
    73 B.R. 616 (Bankr. E.D. Pa. 1987) .................................................................25

*Gen. Datacomm Indus. v. Arcara (In re General Datacomm Indus.)*,
    407 F.3d 616 (3d Cir. 2005).........................................................................18

*Kapila v. United States (In re Taylor)*, 386 B.R. 361 (Bankr. S.D. Fla.),
    *aff'd*, 402 B.R. 56 (S.D. Fla. 2008)................................................................18

*Kerr-McGee Chemical, LLC v. Kemira Pigments Oy*
    *No. Civ. A. 03-191-GMS*, 2003 WL 22299045 (D. Del. Oct. 7, 2003)..................................17

*In re Koneta*,
    357 B.R. 540 (Bankr. D. Ariz. 2006) ...............................................................23

*Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*,
    183 B.R. 65 (Bankr. S.D.N.Y. 1995), *aff'd*, 114 F.3d 379 (2d Cir. 1997) ...........................25

*In re Roth Am., Inc.*,
    975 F.2d 949 (3d Cir. 1992)........................................................................23

*In re Springfield Furniture, Inc.*,
    145 B.R. 520 (Bankr. E.D.Va. 1992)................................................................24

*The Official Committee of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines, Inc.)*, 928 F.3d 565 (2d Cir. 1991) ......................................................20

*United States v. Novak*,
    476 F.3d 1041 (9th Cir. 2007) .....................................................................10

*United States v. Sims (In re Feiler)*,
    218 F.3d 948 (9th Cir. 2000) ......................................................................18

*W. Pac. R. R. Corp. v. W. Pac. Rail Co.*,
    197 F.2d 994 (9th Cir. 1951), *rev'd on other grounds*, 345 U.S. 247 (1953)........................19

*In re Waterfront Cos., Inc.*,
   56 B.R. 31 (Bankr. D. Minn. 1985) ..............................................................................23, 24

*In re Weisser Eyecare, Inc*,
   245 B.R. 844 (Bankr. N.D. Ill. 2000) ...................................................................................23

## STATE CASES

*Amirsaleh v Board of Trade of N.Y., Inc.*,
   No. 2822-CC, 2009 Del. Ch. LEXIS 192 (Del. Ch. Nov. 9, 2009) .......................................17

*Amirsaleh v Board of Trade of N.Y., Inc.*,
   No. 2822-CC, 2008 Del. Ch. LEXIS 131 (Del. Ch. Sept. 11, 2008) ......................................19

*Case v. New York C. R. Co.*,
   15 N.Y.2d 150 (1965) .............................................................................................................19

*Markham v. Bradley*,
   73 P.3d 865 (Utah 2007).....................................................................................................17, 18

*Meyerson v. El Paso National Gas Co.*,
   246 A.2d 789 (Del. Ch. 1967).................................................................................................19

## FEDERAL STATUTES AND REGULATIONS

11 U.S.C. § 362(d)(1) ......................................................................................................................10

11 U.S.C. § 363(b) ...........................................................................................................................24

26 U.S.C. §172(b)(3) ........................................................................................................................12

26 U.S.C. § 1501 ................................................................................................................................5

26 U.S.C. § 6402(k) ................................................................................................................. *passim*

26 C.F.R. § 1.1502-77...........................................................................................................5, 12, 13

26 C.F.R. § 1.1502-78.................................................................................................................12, 13

26 C.F.R. § 301.6402-7 ............................................................................................................ *passim*

26 C.F.R. § 301.9100-1(b) ...............................................................................................................22

26 C.F.R. § 301.9100-2(b) ...............................................................................................................22

26 C.F.R. § 301.9100-2(c) ...............................................................................................................22

## LEGISLATIVE HISTORY

H.R. Rep. No. 100-795 (1988) (Conf Rep.)......................................................................................11

Plaintiff Advanta Bank Corp. ("ABC") and the Federal Deposit Insurance Corporation as receiver of ABC (the "FDIC-R"), submit this Pre-Hearing Brief on (i) the Motion of ABC For Declaratory and Injunctive Relief In Connection With Its Amended Complaint against Advanta Corp. (the "Injunction Motion"), and (ii) the FDIC's Motion Seeking a Declaration That the Automatic Stay Does Not Apply or, In the Alternative, an Order Granting Relief From the Automatic Stay (the "Lift Stay Motion" and, together with the Injunction Motion, the "Motions").

## PRELIMINARY STATEMENT

1.      The Motions raise three principal legal questions.  The first question is whether Advanta Corp. ("Advanta") can make tax elections for its affiliated group of companies (the "Affiliated Group") that harm one of Advanta's subsidiaries (ABC) without compensating ABC. The answer to that question is "no."

2.      The second question is whether the FDIC-R, as receiver of ABC, can undo that harm under federal statutes and regulations designed to address precisely this situation.  The answer to that question is "yes."

3.      The third question is whether it is an "ordinary course" business decision for Advanta to waive a tax refund to which the Affiliated Group was otherwise entitled, particularly when, among other things, (a) Advanta had never waived a refund to which the Affiliated Group was otherwise entitled before and (b) Advanta thought it necessary to (and did) have its board of directors and the Official Committee of Unsecured Creditors (the "Committee") ratify that decision.  The answer to that question is "no."

4.      The Tax Sharing Agreement (the "TSA") between the members of the Affiliated Group states that it is intended to ensure that each member of the Affiliated Group will not pay

more in taxes or receive less of a refund than the member would have paid or received had the member filed its own separate return. This intent is made clear, among other places, in the fourth introductory recital of the TSA, which states in pertinent part:

> [T]he filing of such consolidated returns shall be beneficial rather than disadvantageous to each Member company and that each Member company should not with respect to any year, or part thereof, for which it is a Member of the Affiliated Group be required to pay more in lieu of taxes or receive a payment in lieu of a refund less than it would have paid or received if the Member company had at all times computed and paid its tax liability on a separate return basis. It is intended that this will comply with the pro rata method as defined in SFAS 109 and its interpretation and all consideration of regulatory accounting principles. (JX 1.)[1]

5.     Between 2004 and 2008, ABC generated substantial income and paid $170 million in tax sharing payments to Advanta to compensate Advanta for taxes that it paid to the federal government on behalf of the Affiliated Group on income generated by ABC. In 2009, during the financial crisis, ABC suffered substantial net operating losses ("NOLs") for the first time in nearly 20 years – approximately $570 million.

6.     As a result, ABC was entitled to a $170 million tax refund if those NOLs were carried back five years from 2009 as permitted by a new law passed as part of the economic stimulus package. The parties also agree that, had Advanta made that election, Advanta would have received a $54 million refund from the Internal Revenue Service ("IRS"), which could have been used to partially offset Advanta's $170 million tax sharing obligation to ABC.

7.     That was the "benefit of the bargain" to ABC under the TSA. When ABC generated taxable income, it made tax sharing payments to Advanta. When ABC generated NOLs, it should have received tax sharing payments from Advanta.

---

[1] "JX" references are to joint hearing exhibits, "PX" references are to the FDIC-R's exhibits, "DX" references are to Defendants' exhibits, and "AS" references are to accounting sources referenced by the parties. Deposition excerpts are abbreviated ("[Deponent's last name] at __.").

8.     A now bankrupt Advanta – arm-in-arm with the Official Committee of Unsecured Creditors (the "Committee") – is trying to escape those obligations.  They contend that the TSA does not mean what it says in plain English because of its references to Generally Accepted Accounting Principles ("GAAP").  Their logic is as follows:  (1) Advanta had the sole authority to make tax elections for the Affiliated Group; (2) Advanta elected to waive carrying back the 2009 NOLs five years, foregoing the $54 million consolidated refund, because doing otherwise would have generated a claim by ABC of $170 million; and (3) ABC (and the FDIC-R) therefore have no recourse because, under GAAP, Advanta's election "controls" Advanta's tax sharing obligations to ABC under the TSA.

9.     That argument is circular and, if accepted, would vitiate the TSA.  There is nothing in the TSA or in GAAP that says that "the parent's election controls" and that, when the parent makes an election that harms a subsidiary, the subsidiary has no recourse.  Such an interpretation would eviscerate the stated purpose of the TSA – to ensure that members of the Affiliated Group do no worse by participating in the consolidated return than they would have if they filed their own separate return.

10.     Even if Advanta's election does control how tax sharing obligations are calculated under the TSA, the duty of good faith and fair dealing prevents Advanta from exercising its discretion to strip ABC of the benefit of its bargain.  By electing not to carryback the 2009 consolidated NOLs, Advanta has, in effect, stolen ABC's NOLs for Advanta's own purported benefit.  ABC is thus entitled to compensation in the amount of $170 million.

11.     And even if ABC somehow is not entitled to compensation because Advanta's election once "controlled" the parties' respective obligations and rights under the TSA, Advanta's election longer controls.  Under Section 6402(k) of the Internal Revenue Code

("IRC") and Treasury Regulation ("Treas. Reg.") § 301.6402-7, the election by the common parent of any affiliated group of companies that includes a bank in receivership to waive the carryback period with respect to a consolidated NOL in a loss year is not effective with respect to the portion of the NOL attributable to such bank subsidiary. In addition, pursuant to Section 6402(k) and Treas. Reg. § 301.6402-7, the FDIC-R has the authority to act as co-agent for any group of affiliated companies that includes a bank in receivership. That authority includes the right to make its *own* subsequent tax elections reversing Advanta's elections so that the FDIC-R is not forced to fund other creditors' recoveries by foregoing monies to which ABC was entitled.

12. Finally, Advanta's tax elections are also void as they were made outside of the ordinary course of business and in violation of Section 363(b) of the Bankruptcy Code. Advanta had never before waived a tax refund to which the consolidated group was otherwise entitled, nor had Advanta ever declined to seek a six-month extension to file the consolidated tax returns. Advanta spent months debating its tax elections, consulting with the Committee (but not ABC), and even putting the decision to a vote of its board. Advanta's contention that this decision was somehow "ordinary" does not pass the proverbial smell test.

13. The Motions should be granted, Advanta's tax elections voided, and the FDIC-R permitted to file tax returns undoing Advanta's tax elections.

## BACKGROUND

14. The factual background of this case is undisputed.

## I. ADVANTA AND ABC

15. Advanta is a Delaware corporation and is the common parent of an affiliated group of corporations, including ABC. (Stip. Facts ¶ 1.)[2] ABC was a Utah-chartered industrial

---

[2] "Stip. Facts ¶ __" refers to the Statement of Uncontested Facts in the Joint Pretrial Memorandum.

bank.  (*Id.* ¶ 2.)  Prior to May 30, 2009, ABC was one of the largest issuers of business purpose credit cards to small businesses and business professionals in the United States.  (*Id.* ¶ 3.)  ABC was subject to oversight and regulation by the FDIC and Utah Department of Financial Institutions.  (*Id.* ¶ 5.)  On November 8, 2009, Advanta and certain of its affiliates, but not ABC, filed for relief under Chapter 11 of title 11 of the United States Code.  (*Id.* ¶ 7.)

## II.  THE TAX SHARING AGREEMENT

16.     The IRC authorizes affiliated corporate groups to file consolidated income tax returns.  (*Id.* ¶ 10.)  Section 1501 of the IRC provides that "[a]n affiliated group of corporations shall . . . have the privilege of making a consolidated return with respect to the income tax imposed by [the IRC] for the taxable year in lieu of separate returns."  26 U.S.C. § 1501.

17.     Consistent with Section 1501 of the IRC, the Secretary of the Treasury has promulgated regulations governing the filing of tax returns by consolidated tax groups that provide that "the common parent . . . for a consolidated return year is the sole agent (agent for the group) that is authorized to act in its own name with respect to all matters relating to the tax liability for that consolidated return year, for – (A) Each member in the group…"  26 C.F.R. § 1.1502-77(a).  (*Id.* ¶ 11.)

18.     Advanta and the Affiliated Group entered into the TSA, the applicable version of which is dated as of May 1, 1995.  (*Id.* ¶ 12.)  The TSA governs the rights and obligations of members of the Affiliated Group with respect to each member company's share of the Affiliated Group's tax burdens and benefits in connection with each consolidated return and is designed to ensure that each member of the Affiliated Group is treated fairly and equitably.  (*Id.*)  Pursuant to the TSA, beginning in at least 1995 and each tax year up to and including 2009, ABC was included in the consolidated federal income tax return filed by Advanta and the Affiliated Group pursuant to Section 1501 of the IRC.  (*Id.* ¶ 13.)

### III. THE 2009 TAX ELECTIONS

19.     Between at least 1995 and 2008, inclusive, Advanta made tax elections for the Affiliated Group each year and any tax sharing payments between members of the Affiliated Group were made pursuant to the TSA.  (*Id.* ¶ 14.)

20.     The Affiliated Group is a calendar year taxpayer and its federal income tax return for the 2009 tax year was due on or before March 15, 2010.  (*Id.* ¶ 15.)  Since 1995 and until Advanta's bankruptcy filing, Advanta annually sought and obtained a six-month extension to file the Affiliated Group's federal income tax return.  (*Id.* ¶ 16.)  Prior to 2009, Advanta had never waived a tax refund to which the Affiliated Group was entitled.  (Albert Dep. at 64:20-65:12.)

21.     The Affiliated Group had consolidated NOLs totaling $8,123,872 and $628,081,799 in the 2008 and 2009 taxable years, respectively.  (*Id.* ¶ 18.)  No portion of the 2008 consolidated NOL is attributable to the operations of ABC and its subsidiary, Advanta Business Receivables Corp. ("ABRC").  (*Id.* ¶ 19.)  Approximately $570,000,000 (or 90%) of the 2009 consolidated NOL is attributable to the operations of ABC and ABRC.  (*Id.* ¶ 20.)

22.     Section 172(b)(1)(A) of the IRC provides a default rule that an NOL generally is carried back to the two preceding tax years (the "Two-Year NOL Carryback"), with any remaining portion of the NOL carried forward to the twenty subsequent tax years.  (*Id.* ¶ 21.)  Section 172(b)(3) of the IRC allows a taxpayer to elect to waive an NOL carryback, in which case the full NOL carries forward.  (*Id.*)  In November 2009, Section 172(b)(1)(H) of the IRC was enacted, giving taxpayers the option to extend the carryback period for any 2008 or 2009 NOL (but not both) from two preceding tax years to up to the five preceding tax years (the "Five-Year NOL Carryback").  (*Id.*)

23.     Beginning in November 2009, Advanta engaged in extensive analysis, including consultation with the Committee, regarding the potential impact of various tax elections available for the 2009 tax year. ABC was not a participant in these discussions. (*Id.* ¶ 22.)

24.     It is undisputed that the application of either the Five-Year NOL Carryback or the Two-Year NOL Carryback for the 2009 NOL would have resulted in an unsecured claim against Advanta by ABC in the amount of approximately $170 million in the case of a Five-Year NOL Carryback and approximately $70.6 million in the case of a Two-Year NOL Carryback. (*Id.* ¶ 23.) These amounts are based upon the hypothetical tax refund that ABC would have been entitled to if it had filed separate returns and an election to carry back the 2009 NOLs for five years or two years, respectively, was in effect. (*Id.*; Browne Decl. ¶ 9 (PX 13).)

25.     It is also undisputed that, if Advanta had not waived the carryback of the Affiliated Group's 2009 NOL and had made the Five-Year NOL Carryback election for 2009, the potential tax refund due to the Affiliated Group from the IRS would be approximately $54 million, and if the Two-Year NOL Carryback had applied to the 2009 NOL the potential tax refund would be approximately $27 million. (Stip. Facts ¶ 24.)

26.     In the days immediately prior to the March 15, 2010 filing deadline, ABC repeatedly sought information from Advanta as to (i) whether Advanta would file a consolidated 2009 federal income tax return on or before the tax deadline or whether it would seek an extension to file the return and (ii) whether Advanta would elect the Five-Year NOL Carryback. (*Id.* ¶ 25; *see also* Declaration of Kenneth Goldman ("Goldman Decl."), attached as Ex. B to the Joint Pretrial Memorandum.) Advanta did not provide the requested information. (*Id.*)

27.     ABC requested by letter dated Wednesday, March 10, 2010 that Advanta, as common parent of the Affiliated Group for the purposes of the consolidated return regulations,

affirmatively elect the Five-Year NOL Carryback treatment with respect to the Affiliated Group's 2009 NOL and that Advanta file the Affiliated Group's consolidated 2009 federal income tax return as soon as possible. (*Id.* ¶ 26.)

28. On March 11, 2010, the Advanta Board of Directors convened a telephonic meeting. (*Id.* ¶ 27.) At that meeting, Advanta's Board of Directors and management discussed (i) electing not to carryback any NOLs on the Affiliated Group's 2009 federal tax return and waiving any right to any 2009 NOL carryback and (ii) electing instead to amend the Affiliated Group's 2008 federal tax return to carry back NOLs for fiscal year 2008 for five years. (*Id.*)

29. At the conclusion of the March 11, 2010 board meeting, Advanta's Board of Directors passed resolutions authorizing: (i) the filing on or before March 15, 2010, of the Affiliated Group's 2009 federal tax return; (ii) the waiver of any NOL on the Affiliated Group's 2009 federal tax return, assuming the Creditors' Committee confirmed that it had no objection to such action; and (iii) amending the Affiliated Group's 2008 federal tax return to elect to carryback the NOL from 2008 for five years, assuming that the Creditors' Committee confirmed it had no objection to such action. (*Id.* ¶ 28.)

30. On Friday, March 12, 2010, ABC filed an Emergency Motion for Entry of An Order Compelling Debtor Advanta Corp. To (I) Timely File a Request For An Extension of Time To File 2009 Consolidated Federal Income Tax Return; Or, In the Alternative (II) Elect To Carry Back 2009 Consolidated Net Operating Losses Five Years. (*Id.* ¶ 30.)

31. On Sunday, March 14, 2010, having by then received confirmation that the Creditors' Committee supported the Tax Elections Advanta proposed to make, Advanta e-filed a 2009 consolidated federal income tax return for the Affiliated Group (the "2009 Consolidated Return"). (*Id.* ¶ 31.) In the 2009 Consolidated Return, Advanta did not elect the Five-Year

NOL Carryback with respect to the Affiliated Group's 2009 NOL.  (*Id.*)  Instead, Advanta elected to waive any NOL carryback with respect to the Affiliated Group's 2009 NOL, resulting in the carryforward of the full 2009 NOL (the "2009 Tax Election").  (*Id.*)

32.     The same day, Advanta filed an amended 2008 consolidated federal income tax return for the Affiliated Group (the "2008 Consolidated Return") electing the Five-Year NOL Carryback with respect to the Affiliated Group's 2008 NOL (the "2008 Tax Election", and together with the 2009 Tax Election, the "Tax Elections").  (*Id.* ¶ 32.)

33.     As a result of the Tax Elections, Advanta waived the $54 million tax refund that it would have received had it elected to carryback the NOLs five years from 2009.  (*Id.* ¶ 34.)

34.     Advanta did not seek or obtain Court approval for filing the 2009 Consolidated Return, filing of the amended 2008 Consolidated Return or for the Tax Elections.  (*Id.* ¶ 35.)

## IV.   ABC IS CLOSED AND THE FDIC IS APPOINTED AS RECEIVER

35.     Months before Advanta made the Tax Elections, Advanta believed that ABC would be forced into receivership.  (*Id.* ¶ 36.)  On March 19, 2010, the Utah Department of Financial Institutions found that ABC was insolvent and closed ABC.  (*Id.* ¶ 37.)  The FDIC was appointed as receiver of ABC.  (*Id.* ¶ 39.)

36.     In order to inform the IRS of its fiduciary status pursuant to 26 C.F.R. § 301.6402-7, a fiduciary must file a Form 56-F, Notice Concerning Fiduciary Relationship of Financial Institution, with the applicable Internal Revenue Service Center.  *See* 26 C.F.R. § 301.6402-7(d)(1) ("To satisfy the notice requirement of this paragraph (d)(1), the fiduciary must file Form 56-F, Notice Concerning Fiduciary Relationship of Financial Institution, with the Internal Revenue Service Center indicated on the form.").  (*Id.* ¶ 40.)  The FDIC-R filed a Form 56-F on March 22, 2010.  (*Id.* ¶ 41.)

**ARGUMENT**

## I.  THE LIFT STAY MOTION SHOULD BE GRANTED

37.     The IRC confers broad statutory authority on the FDIC-R to file tax returns on

behalf of financial institutions in receivership.  Section 6402(k) of the IRC provides:

> ***Notwithstanding any other provision of law***, in the case of an
> insolvent corporation which is a member of an affiliated group of
> corporations filing a consolidated tax return for any taxable year
> and which is subject to a statutory or court-appointed fiduciary, the
> Secretary may by regulation provide that any refund for such
> taxable year may be paid on behalf of such insolvent corporation to
> such fiduciary ***to the extent that the Secretary determines that the
> refund is attributable to losses or credits of such insolvent
> corporation***.

26 U.S.C. § 6402(k) (emphasis added); *see also* Treas. Reg. § 301.6402-7(c)(1)(ii) and (iii).

38.     By the Lift Stay Motion, the FDIC-R seeks an Order pursuant to 11 U.S.C.

§ 362(d)(1) holding that, to the extent that the automatic stay applies,[3] it is lifted so that the

FDIC-R, as fiduciary of ABC, may file tax returns (the "FDIC-R Returns") for the Affiliated

Group reversing Advanta's bad faith Tax Elections.

### A.        The FDIC-R Has the Right To File the FDIC-R Returns

39.     As a statutory "fiduciary" of ABC, the FDIC-R has the right to file the FDIC-R

Returns because the 2009 Consolidated Return filed by Advanta prejudices ABC.

Section 6402(k) of the IRC was enacted specifically to overcome the difficulties that a statutory

---

[3] The FDIC-R continues to believe that the automatic stay is not implicated here.  Section 6402(k) of the IRC begins
"[n]otwithstanding any other provision of the law . . . "  The "notwithstanding" clause of Section 6402(k) signals
Congress' intention that Section 6402(k) should override conflicting statutory provisions, and therefore it should be
broadly interpreted to supersede the automatic stay.  *See, e.g.*, *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir.
2007) ("The Supreme Court has indicated as a general proposition that statutory 'notwithstanding' clauses broadly
sweep aside potentially conflicting laws.") (citing *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1983));  *see
also In re Federal-Mogul Global*, 402 B.R. 625, 632 (D. Del. 2009) ("With respect to the Bankruptcy Code,
numerous sections are now prefaced with a notwithstanding clause, and in each instance, the congressional intent
has been interpreted as express preemption.").  Out of an abundance of caution, the FDIC-R is nonetheless seeking
Court approval to file the FDIC-R Returns and reserves all of its rights.

or court-appointed receiver may experience in obtaining tax refunds attributable to that member's losses as a result of actions taken by the common parent.[4]

40.     Under Section 6402, the FDIC-R[5] may file a "loss year" return with respect to the "loss year group" in conjunction with the filing of a claim for refund.  26 C.F.R. §§ 301.6402-7(e)(1) and (3).  A loss year is a taxable year for which any member or former member of the "carryback year group" claims a loss that may be carried back.[6]  *See* 26 C.F.R. § 301.6402-7(b)(5).  A loss year group is "a consolidated group of which a corporation ***that is or becomes an insolvent financial institution*** is a member during a loss year."  26 C.F.R. § 301.6402-7(b)(6) (emphasis added).  The 2009 taxable year is thus a "loss year" with respect to ABC.

41.     Treasury regulations also provide in relevant part that the "fiduciary" may choose to exercise its agency if it does not accept the loss year return or refund claim "filed by the common parent," which clearly connotes the FDIC-R acting *after* a return or claim has been filed by the common parent.  *See* Treas. Reg. § 301.6402-7(e)(1) ("***[i]f . . . the fiduciary does not accept a claim for refund filed by the common parent***, the fiduciary may claim a refund under this section by filing its own claim for refund under section 6402") (emphasis added); *see also*

---

[4] The Conference Report on the passage of Section 6402(k) states in relevant part:

> The Secretary of the Treasury is authorized to provide access to tax refunds to a statutory or court appointed fiduciary of an insolvent member of a group of corporations filing a consolidated tax return, to the extent the Secretary determines that the refund is properly attributable to the losses of such insolvent member and that such access is consistent with the purposes [of] the consolidated return provisions.  It is also intended that the Secretary may authorize participation by such fiduciary in the controversy and refund procedure.

H.R. Rep. No. 100-795, at 604 (1988) (Conf. Rep.).

[5] For the purposes of the IRC, the FDIC-R is deemed a "fiduciary" of ABC.  26 C.F.R. § 301.6402-7(b)(3)(i).

[6] A carryback year group is "a consolidated group of which a corporation ***that is or becomes*** an insolvent financial institution is a member during a consolidated carryback year."  26 C.F.R. § 301.6402-7(b)(1) (emphasis added).  The "or becomes" language of the regulations thus contemplates the FDIC's "late" arrival to the tax processes of the consolidated return group.

Treas. Reg. § 301.6402-7(e)(3) ("If the institution is a member of a loss year group, and either the common parent does not file a loss year return *or **the fiduciary does not accept the loss year return filed by the common parent***, the fiduciary may file a loss year return with respect to the loss year group.  A loss year return can only be filed by the fiduciary in conjunction with the filing of a claim for refund under paragraph (e)(1).") (emphasis added).

42.     Congress and the Treasury Department thus specifically granted the FDIC-R authority to override the authority vested in the common parent of a consolidated group to file returns pursuant to Treas. Reg. §  1.1502, and particularly Treas. Reg. § 1.1502-77 (Agent for the Group) and Treas. Reg. § 1.1502-78 (Tentative Carryback Adjustments).

43.     The IRC and the regulations promulgated thereunder not only provide the fiduciary access to tax refunds of an insolvent member of a consolidated group, but also ensure that such access is meaningful.  For example, Treas. Reg. § 301.6402-7(e)(5) provides that any election filed by the common parent of a loss year group under IRC Section 172(b)(3) to relinquish the entire carryback period with respect to a consolidated NOL arising in a loss year is *not effective* with respect to the portion of the consolidated NOL attributable to a subsidiary that is an insolvent financial institution.  Instead, the fiduciary has authority to make the election under Section 172(b)(3) with respect to the portion of the NOL attributable to the institution.

44.     In addition, the common parent agency regulations themselves state that "[f]or further rules applicable to groups that include insolvent financial institutions, see § 301.6402-7 of this chapter."  26 C.F.R. §§ 1.1502-77(g) and 1.1502-78(b)(3).  The placement of these cross references at the end of Sections 1.1502-77 and 1.1502-78 indicate that the rules under Section 301.6402-7 are intended to modify all of the common parent agency provisions.

Accordingly, Section 6402(k) of the IRC and Treas. Reg. § 301.6402-7 are clearly intended to override the common parent agency provisions of Treas. Regs. §§ 1.1502-77 and 1.1502-78.

**B.  Advanta Will Not Be Prejudiced if the FDIC-R Files the FDIC-R Returns**

### 1.  ABC is Entitled to a $170 Million Separate Member Refund

45.  Although IRC and Treasury regulations give the FDIC-R full authority to file the FDIC-R Returns in these circumstances (see note 3, *supra*), Advanta's estate nonetheless will not be prejudiced by the filing of the FDIC-R Returns.  To the contrary, filing the FDIC-R Returns and obtaining the $54 million consolidated tax refund will benefit both Advanta's and ABC's estates by partially offsetting the $170 million owed by Advanta to ABC.

46.  There is no dispute that, had Advanta elected the Five-Year NOL Carryback, ABC would have an unsecured claim for approximately $170 million.  (Stip. Facts ¶ 23.)

47.  Specifically, Section 1 of the TSA states:

> In any year or part thereof in which it is planned that the Affiliated Group and any other affiliated subsidiaries of Advanta Corp . . . should file a consolidated tax return . . . on or before the date provided by law for payment of any federal or state tax or estimated federal or state tax by a Member, or as soon thereafter as the necessary computations have been completed (hereinafter called an "Adjustment Date") a computation shall be made of the accrued taxes or refund of tax properly reflected in the income statement, on a separate basis, that should be reflected under generally accepted accounting princip[le]s.  The amount so computed is hereinafter referred to as the "Separate Member Tax" or the "Separate Member Refund," as the case may be.

48.  Section 3(b) of the TSA obligates Advanta to pay ABC the "Separate Member Refund" that ABC  would have received if ABC had filed its own separate tax return.  It states:

> If on any Adjustment Date there is a Separate Member Refund and the Affiliated Group also is ***entitled to a refund***, ***but such refund is less than the Separate Member refund, Advanta Corp. shall pay to such Member payment in an amount equal to the Separate Member Refund***, together with an allocable share of any interest promptly upon receipt of payment from the taxing authority.  (Emphasis added.)

If Advanta had elected the Five-Year NOL carryback, it would have obtained a consolidated refund from the IRS of $54 million and thus would have owed ABC the greater Separate Member Refund of $170 million.

49.     However, Advanta elected not to carryback the NOLs five years and waived the $54 million refund.  In that circumstance, Section 3(c) of the TSA applies.  That section states: "If on any Adjustment Date there is a Separate member Refund but no Affiliated Group Refund, Advanta Corp. shall pay to the member the amount equal to the Separate Member Refund." Thus, because Advanta received no consolidated refund, it now does not have the benefit of the $54 million consolidated refund to partially offset Advanta's $170 million payment obligation.

### 2.     Advanta's GAAP Argument Fails

50.     Advanta nonetheless contends that it was able to avoid its payment obligations to ABC because Paragraph 1 of the TSA states that the Separate Member Tax or Separate Member Refund must be calculated in accordance with GAAP.  According to Advanta, GAAP "mandates that the parent's election controls."   (Advanta Prelim. Obj. ¶ 41.)   In other words, because Advanta (as the parent company) controls the tax elections, Advanta can make whatever tax elections it wants and, even if Advanta makes a tax election that disadvantages ABC, ABC has no recourse because Advanta made the election and it "controls."  That *ipse dixit* argument fails as a matter of law, logic, and GAAP.

51.     As an initial matter, as discussed above in Section A, even if Advanta's election does "control" under the TSA, under IRC § 6402(k) and Treas. Reg. § 301.6402-7, the FDIC-R became a co-parent of insolvent ABC.  The FDIC-R can now make tax elections for the Affiliated Group and can exercise that authority retroactively.  Thus, the FDIC-R's elections now "control" as much as Advanta's elections do under federal law.

52.     Advanta's argument also fails under GAAP.  As the FDIC-R's accounting expert, Michael Braverman,[7] will testify at the evidentiary hearing, GAAP (including SFAS 109) are standards for presentation and disclosure.  They do not control what tax election the parent makes and do not address whether a parent company can be held liable for making a tax election that disadvantages a subsidiary.

53.     In addition, Mr. Braverman will testify that under GAAP, contrary to Advanta's and its experts' contentions, the parents' election does *not* always control.  Rather, SFAS 109 is perfectly consistent with the TSA.  SFAS 109 specifically permits members of a consolidated group to employ "[a] method that allocates current and deferred taxes to members of the affiliated group . . . to each member as if it were a separate tax payer."  Footnote 10 to paragraph 40 of SFAS 109 states that when subsidiaries are treated as separate taxpayers, "the sum of the amounts allocated to individual members of the group may not equal the consolidated amount."[8] This can occur because subsidiaries may make elections *different* than those made by its parent.

54.     As Mr. Braverman will also testify, the TSA not only refers to GAAP and SFAS 109, but the fourth recital states that the TSA is also intended to comply with all "regulatory accounting principles."  This includes the "Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure" (the "Interagency Policy") issued by the FDIC, the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision.  (PX 10.)  The Interagency Policy is, by

---

[7] Mr. Braverman is a Certified Public Accountant and the Managing Director and Duff & Phelps LLC, a global independent provider of financial advisory and investment banking services.  He has over 20 years of public accounting experience and was previously an audit partner at PriceWaterhouse Coopers LLP, Ernst & Young LLP and Grant Thornton LLP.  He has substantial experience in accounting for deferred tax assets, such as NOLs, and has frequently been called upon to assess and apply tax sharing agreements.

[8] In his deposition testimony, Advanta's CFO, Philip Browne (who is a CPA and former Arthur Andersen partner) agreed that, under SFAS 109, the sum of the subsidiaries' tax provisions may not equal the consolidated group's total.  (Browne Dep. at 28:6-19, 55:14-56:19.)

Advanta's own admission, entirely consistent with the TSA. (Browne Dep. at 80:21-84:6.) The Interagency Policy provides, among other things, in pertinent part:

- A depository institution that is a member of a consolidated group "should record current and deferred taxes as if it files its tax returns on a separate entity basis, *regardless of the consolidated group's tax paying or refund status.***"

- "An institution incurring a loss for tax purposes should record a current income tax benefit *and receive a refund from its parent in an amount no less than the amount the institution would have been entitled to receive as a separate entity.* The refund should be made to the institution within a reasonable period following the date the institution would have filed its own return, *regardless of whether the consolidated group is receiving a refund.*" (Emphasis added.)

55.  Additional guidance can also be found in the Securities and Exchange Commission's (the "SEC") Staff Accounting Bulletin No. 55, *Allocation of Expenses and Related Disclosures in Financial Statements of Subsidiaries, Division or Lesser Business Components of Another Entity.* (AS 32.) In response to Question 3 therein regarding the accounting and disclosure of a subsidiary's income tax expense, it states:

> The staff believes that *it is material to investors to know what the effect on income would have been if the registrant had not been eligible to be included in a consolidated income tax return with its parent.* Some of these subsidiaries have calculated their tax provision on the separate return basis, which the staff believes is the preferable method. (Emphasis added.)

56.  Advanta has attempted to confuse the issues by noting that the FDIC, before it became receiver of ABC, encouraged ABC to change its booking of a tax receivable from Advanta to reflect the fact that ABC was unlikely to receive any tax sharing payment from Advanta. Advanta contends that the FDIC thus agreed that ABC was not entitled to any refund under the TSA. That is false.

57.  As Clay Sunderland of the FDIC testified, the FDIC always believed that ABC was entitled to the full refund. (Sunderland Dep. at 51:5-52:25, 56:5-59:12.) However, the FDIC did not think that the tax receiveable was a "bankable asset" because, among other things,

Advanta had said that it would "disaffirm the tax sharing agreement". (DX 13.) Accordingly, even if ABC was entitled to the refund, the refund could not be considered in the proverbial bank because Advanta had stated, among other things, that it was not going to make the payment under any circumstances. But that does not imply that ABC was not entitled to the refund.

58. Finally, even if there were some ambiguity created by the GAAP references in the TSA, ambiguities in contracts are to be interpreted against the drafter. *See, e.g.*, *Kerr-McGee Chem., LLC v. Kemira Pigments Oy*, No. Civ. A. 03-191-GMS, 2003 WL 22299045, at *6 (D. Del. Oct. 7, 2003) (holding that "any perceived ambiguity must be construed against . . . as the self-proclaimed drafters of the language that creates this ambiguity"). The TSA was drafted solely by Advanta and was not negotiated. (Albert Dep. at 65:23-66:11.) Thus, any ambiguity must be construed against Advanta.

### 3. Advanta Also Breached the Duty of Good Faith and Fair Dealing

59. Advanta's Tax Elections breached not only the express terms of the TSA, but also the duty of good faith and fair dealing. That duty is implied in every contract and is intended to protect the spirit of a contract and the reasonable expectations of the parties. *See Amirsaleh v Bd. of Trade of N.Y., Inc.*, No. 2822-CC, 2009 Del. Ch. LEXIS 192, at *13 (Del. Ch. Nov. 9, 2009) ("the implied covenant is 'best understood' as a judicial tool used to imply terms in a contract that protect the reasonable expectations of the parties to (or beneficiaries of) the contract"); *Markham v. Bradley*, 173 P.3d 865, 871 (Utah 2007) ("Under [the covenant], both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract.").

60. The duty applies even where the contract gives one or both of the parties discretion in its execution. *See Amirsaleh v. Bd. of Trade of N.Y.*, No. 2822-CC, 2008 Del. Ch. LEXIS 131, at *30 (Del. Ch. Sept. 11, 2008) ("[T]he implied covenant [of good faith and fair

dealing] 'is particularly important . . . in contracts that defer a decision at the time of contracting and empower one party to make that decision later'"); *Markham*, 173 P.3d at 872 ("even where a contract expressly provides a privilege to one party, the exercise of that right is subject to the covenant of good faith and fair dealing") (citation omitted).

61.     Critically, the duty of good faith and fair dealing also prevents a party to a contract from frustrating the contract's purpose by preventing the occurrence of a condition precedent.  *See Gen. Datacomm Indus. v. Arcara (In re Gen. Datacomm Indus.)*, 407 F.3d 616, 622 (3d Cir. 2005) (refusing to excuse party from contractual obligation where party prevented condition precedent from occurring) (citation omitted).

62.     As stated in the fourth recital of the TSA, the TSA is intended to benefit all Affiliated Group members through the filing of a consolidated tax return. ABC reasonably expected that it would benefit equally from the arrangement just as, for years, Advanta benefited from it by collecting hefty tax sharing payments from ABC.  When it came time for ABC to receive a tax sharing payment, Advanta and the Committee concocted a clever scheme (too clever by half) to deprive ABC of the benefit of the bargain for the purported benefit of other creditors.  In so doing, Advanta breached the TSA.[9]

### 4.     Advanta Breached Its Fiduciary Duties to ABC

63.     Advanta also breached its fiduciary duties to ABC.  The fundamental question in an evaluation of the fiduciary duty owed by a parent to its subsidiary, (and any purported breach

---

[9] For similar reasons, the Tax Elections resulted in a constructive (if not actual) fraudulent transfer.  It is well-settled that, when a debtor elects to waive a carryback of an NOL, and "relinquish [its] right to an immediate tax refund in exchange for future tax considerations, a transfer has occurred."  *United States v. Sims (In re Feiler)*, 218 F.3d 948, 956 (9th Cir. 2000); *see also Kapila v. United States (In re Taylor)*, 386 B.R. 361 (Bankr. S.D. Fla.), *aff'd*, 402 B.R. 56 (S.D. Fla. 2008).  Advanta's waiver of a $54 million tax refund for little or no benefit in return thus amounts to (i) a transfer, (ii) made without receiving reasonably equivalent value in exchange, (iii) while Advanta was insolvent.  *Brandt v. Trivest II, Inc. (In re Plassein Int'l. Corp.)*, No. 03-11489 (KG), 2008 Bankr. LEXIS 1473, at *17 (Bankr. D. Del. May 5, 2008).

thereof) is "was the subsidiary treated fairly?" *Meyerson v. El Paso Nat. Gas Co.*, 246 A.2d 789, 790 (Del. Ch. 1967). "A parent company is not acting in the best interests of its subsidiary when it seeks to appropriate to itself an advantage which the tax laws give the subsidiary." *W. Pac. R. R. Corp. v. W. Pac. Rail Co.*, 197 F.2d 994, 1004 (9th Cir. 1951), *rev'd on other grounds*, 345 U.S. 247 (1953). "Unfairness" is characterized by a "misuse of power" that results in an undue advantage to the dominant party. *See, e.g.*, *Case v. New York C. R. Co.*, 15 N.Y.2d 150, 156-57 (1965) (citing cases). The proper focus, then, is on an "undue advantage laid off against loss of advantage." *Id.* at 157. Where "the unfairness is startling and the consequences disastrous," a parent has breached its fiduciary duties to its subsidiary. *Id.*

64. ABC was treated unfairly. Advanta not only acted deliberately to strip ABC of the tax benefits of ABC's NOLs for Advanta's own purported benefit, but its actions were led by three one-time dual officers or directors of Advanta and ABC – William Rosoff, Dennis Alter, and Philip Browne. Although each man resigned his position at ABC before the Tax Elections were made (at the FDIC's urging due in large part to concerns about prospective tax elections and prior attempts to further Advanta's interests at the expense of ABC), they had already begun laying the groundwork for the Tax Elections. (PX 3, PX 4, PX 7.)

65. Advanta then stonewalled ABC when it requested information about Advanta's intentions. (Stip. Facts. ¶¶ 25-27, 29.) Advanta's purported business justification for these actions – a misguided attempt to avoid a $170 million claim by ABC – does not erase the manifest unfairness to ABC of Advanta's actions.

### 5. Any Alleged Benefit of the 2009 NOLs Going Forward is Speculative

66. Advanta asserts that the Tax Elections actually benefit Advanta's estate because the "waiver of the 2009 NOLs allows the 2009 NOL to be carried forward," which "*may* ultimately make available to Advanta a worthless stock loss (in lieu of portion of the

consolidated group's net operating loss incurred by ABC)." (Advanta Prelim. Objection ¶ 34) (emphasis added). However, in contrast to carrybacks, which "result in the right to a tax refund of a definite amount," carryforwards "are speculative since their value depends on the availability of future income against which to apply them." *The Official Committee of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines, Inc.)*, 928 F.3d 565, 572 (2d Cir. 1991). By contrast, the Tax Elections give rise to an *immediate and definite* claim by ABC under the TSA.

67.     Advanta's ability to carry forward the 2009 NOLs for future benefit to Advanta is contingent principally on the recognition of future income from selling its interest in a partnership with Bank of America ("BofA"). However, as Advanta has acknowledged, selling the BofA interest would be a "complex and difficult process" that would receive an "uncertain reaction from BofA". (PX 11; Browne Dep. at 104:12-20.) As Mr. Braverman will testify, had Advanta actually expected taxable income from its interest in BofA, to which it would apply the NOLs, Advanta would have been required under GAAP to record a deferred tax liability. Advanta has never done so. (Albert Dep. at 228:22-230:3.)

68.     Further, even if the BofA gain was realized and the NOLs were used in the future to the benefit of Advanta, paragraph 4 of the TSA requires that Advanta compensate ABC for their use. Paragraph 4 of the TSA states:

> If on any Adjustment Date the separate return computation for a Member would show a loss but not a Separate Member Refund, Advanta Corp. *shall pay to the Member an amount equal to the amount of the loss which results in a tax benefit, determined in a manner consistent with the allocation of tax due to taxable Members*, from those losses on the consolidated return. (Emphasis added.)

Thus, were Advanta ever to receive a benefit from ABC's NOLs, Advanta would be required under the TSA to pay ABC the amount of the ABC loss that generates any such benefit.

### C. The FDIC-R Will Face Substantial Hardship if it is Not Permitted To File the FDIC-R Returns

69.     Advanta's decision not to elect the Five-Year NOL Carryback, without consulting with ABC, harmed ABC by depriving it of $170 million.  Preventing ABC from filing an amended tax return would prejudice the FDIC-R, as successor to ABC, because 90% of the $54 million consolidated refund is attributable to NOLs incurred by ABC.  (Stip. Facts ¶ 20.)  If that refund is not secured soon, it will be forever lost to both the FDIC-R and Advanta's estate.

### D. The IRS Is Likely To Honor the FDIC-R Returns

70.     As discussed above, IRC Section 6402(k) and Treas. Reg. § 301.6402-7 permit the FDIC-R to file an FDIC-R Return and claim and receive refunds of federal income taxes with respect to the NOLs attributable to ABC.  ABC's contribution to the consolidated NOLs of the Affiliated Group in the 2009 taxable year are undisputed.  (Stip. Facts ¶ 20.)  Therefore, the FDIC-R's likelihood of success with respect to having the FDIC-R Returns it files accepted and acted upon by the IRS is very high (and will be even higher if the Court voids the Tax Elections as requested in the Injunction Motion).

### E. The FDIC-R Returns Must be Filed by September 15, 2010

71.     The regulations issued under IRC Section 6402 do not specify the time frame within which the FDIC-R must file an alternative loss year return or a refund claim on behalf of an insolvent financial institution.  However, the five-year carryback election is subject to its own rules.  Pursuant to Section 172(b)(1)(H)(iii) of the IRC and Rev. Proc. 2009-52, 2009-49 IRB 744, a taxpayer (including a consolidated group) may make the five-year carryback election by attaching a statement to its return (which may be an amended return) for the taxable year in which the "applicable NOL" arises.  The return and statement must be filed on or before the due date (including extensions) of the return for the taxpayer's last taxable year beginning in 2009.

72.     Advanta's Consolidated 2009 Return was due on March 15, 2010.  However, Treasury Regulation Section 301.9100-2(b) provides for an automatic six-month extension from the due date of a return excluding extensions for the making of a "statutory election" whose due dates are the due date of the return or the due date of the return including extensions.[10]  To be entitled to this extension, the taxpayer must have timely filed its return for the year the election should have been made *and* the taxpayer must take "corrective action" pursuant to the regulations *within that six-month extension period*.  26 C.F.R. § 301.9100-2(b).[11]

73.     Further support for this interpretation of the statute and regulations is found in IRS Publication 536 – Net Operating Losses (NOLs) for Individuals, Estates, and Trusts for use in preparing 2009 returns.  The section dealing with special rules for 2008 or 2009 NOLs states:

> An election to apply a 3, 4, or five-year carryback period must be filed by the due date (including extensions) for filing your 2009 return.  If you filed your return on time without making the election, you can still make the election on an amended return filed within 6 months of the due date of the return (excluding extensions) by attaching the election to the amended return, and writing "Filed pursuant to section 301.9100-2" on the election statement.

74.     Based on the above, the FDIC-R has no later than September 15, 2010 to elect the application of the five-year carryback rule with respect to the 2009 NOLs attributable to ABC.

---

[10] An election includes an application for relief in respect of tax and a "statutory election" means an election whose due date is prescribed by statute and should include the election contemplated in Section 172(b)(1)(H) of the IRC.  *See* 26 C.F.R. § 301.9100-1(b).

[11] "Corrective action" means taking the steps required to file the election in accordance with the statute or the regulation published in the Federal Register, or the revenue ruling, revenue procedure, notice, or announcement published in the Internal Revenue Bulletin and complying with all other requirements.  *See* 26 C.F.R. § 301.9100-2(c); *see also Diesel Performance, Inc.*, T.C. Mem. 1999-302 (1999).

## II.  THE INJUNCTION MOTION SHOULD BE GRANTED

75.    The FDIC-R not only has the authority to override the Tax Elections, but the Tax Elections themselves are void.  They were made outside of the ordinary course of business, without prior notice and hearing, in direct violation of Section 363(b) of the Bankruptcy Code.

### A.    Advanta's Tax Elections Were Not Ordinary Course Transactions

76.    Where a transaction or use of property is outside the ordinary course of the debtor's business because it falls outside the reasonable expectations of creditors, it is void and unenforceable.  *See In re Roth Am., Inc.*, 975 F.2d 949, 954 (3d Cir. 1992); *In re Koneta*, 357 B.R. 540, 543 (Bankr. D. Ariz. 2006); *In re Weisser Eyecare, Inc*, 245 B.R. 844, 850 (Bankr. N.D. Ill. 2000); *In re Waterfront Cos., Inc.*, 56 B.R. 31, 34 (Bankr. D. Minn. 1985).  The burden is on Advanta to establish that the Tax Elections were ordinary course.  *See Baumgart v. Nat'l City Bank (In re Wright Airlines, Inc.)*, 88 B.R. 146, 148 (Bankr. N.D. Ohio 1988) ("Pursuant to Rule 6001, Bankr.R., the burden of proof as to the validity of a postpetition transfer [under 11 U.S.C. § 363(b)(1)] is on the party asserting the validity of the transfer.").

77.    Advanta's decision to make the Tax Elections and waive a $54 million tax refund was not an ordinary course transaction.  As discussed above, it breached the TSA and breached Advanta's fiduciary duties to ABC.  In addition, it is undisputed that, prior to 2009:  (i) Advanta had always sought a six-month extension to file its tax returns (Stip. Facts ¶ 16); (ii) Advanta had never previously waived a tax refund to which the Affiliated Group was otherwise entitled (Albert Dep. at 64:20-65:12); (iii) Advanta had never previously made tax elections that were disadvantageous to another member of the Affiliated Group (Albert Dep. at 98:12-23, Browne Dep. at 69:3-7); (iv) Advanta's management and Board of Directors thought it necessary to engage in (and did engage in) lengthy consultation with Advanta's advisors as well as with the Committee over what tax elections to make (Stip. Facts ¶ 22); and (v) Advanta's management

and Board of Directors thought it necessary to (and did) pass a board resolution authorizing the Tax Elections (*id.* ¶¶ 27-28).

78.     That Advanta considered the Tax Elections important enough to require board approval alone renders the decision outside of the ordinary course.  *See Fed. Deposit Ins. Corp. v. Goldberg*, 906 F.2d 1087, 1093 n.16 (5th Cir. 1990) ("Indeed, one could argue that *any* action which requires a special meeting of the Board of Directors is *de facto* not an 'ordinary' one."); *In re Springfield Furniture, Inc.*, 145 B.R. 520, 537 (Bankr. E.D.Va. 1992) (holding that debtor employer's postpetition contribution to defined benefit pension plan was not in ordinary course of business because plan contributions was approved by debtor's board of directors in minutes of their meetings); *In re Waterfront Cos., Inc.*, 56 B.R. at 36 n.5 ("Once it is determined that a transaction would require approval of the directors or shareholders, then that transaction is not in the ordinary course of business and therefore may not be entered into without notice and a hearing.").  In short, there was nothing "ordinary" about the Tax Elections.

### B.     The Tax Elections Are Void *Ab Initio*

79.     Section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b) (emphasis added).  Advanta's decision to ignore Section 363(b) was a calculated strategic decision made with the Committee.

80.     While Advanta engaged in "extensive analysis" and "consultation" with its advisors and the Committee (Stip. Facts ¶ 22), it stonewalled ABC – Advanta's subsidiary and the creditor with the most at stake in the carryback election (*id.* ¶¶ 25-26, 29).  As William Rosoff, President and Vice Chairman of the Board of Advanta, admitted, once Advanta decided to waive the refund, Advanta "did not want to do anything that could take control of that decision . . . out of [Advanta's] hands."  (Rosoff Dep. at 302:18-305:18.)  As Philip Browne,

Advanta's Chief Financial Officer, confirmed, that not only meant attempting to take control away from the FDIC-R, but also from this Court. (Browne Dep. at 194:4-195:6.)

81.     Courts have consistently held that, where the notice requirement under Section 363(b) is not met, the challenged act is void *ab initio*. *See, e.g., Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 183 B.R. 65, 70-71 (Bankr. S.D.N.Y. 1995), *aff'd*, 114 F.3d 379, 385 (2d Cir. 1997) (holding debtor-in-possession's attempt to cancel an insurance policy without notice to interested parties was null and void as a violation of the notice provisions of Section 363(b)); *Fernwood Markets v. Title Ins. Co.*, 73 B.R. 616, 619 (Bankr. E.D. Pa. 1987) (collecting "ample authority . . . for the principle that sales within the scope of § 363(b)(1), of which no proper notice was provided, may be set aside."). Advanta is not entitled to a "do-over." Advanta needed Court permission to make the Tax Elections and deliberately chose not to seek that permission. The Tax Elections should be voided.[12]

## CONCLUSION

The TSA was intended to benefit all members of the Affiliated Group. It was not intended to benefit Advanta when it was owed tax sharing payments but disadvantage ABC when it was owed tax sharing payments. Application of esoteric GAAP rules and guidance cannot undo either the plain meaning or intent of the TSA. Even if Advanta's implausible proposition were true – that in normal circumstances Advanta would have unfettered authority as parent company to make whatever tax elections it wanted without having to make tax sharing payments – the FDIC-R is now a co-parent company under the IRC and applicable Treasury regulations and thus can undo Advanta's elections.

---

[12] In an attempt to delay, Advanta has also argued that the IRS is a required party and the Committee has argued that the relief sought by ABC in the Injunction is barred by laches. The FDIC-R incorporates by reference the arguments made in its moving papers on these two points and will not repeat them here.

There is no reason for further delay. The September 15 filing deadline is fast approaching. The Motions should be granted.

WHEREFORE, the FDIC-R respectfully requests that the proposed orders it has submitted in connection with the Motions be entered at the earliest possible date prior to September 15, 2010.

Dated: August 13, 2010          Respectfully submitted,
      Wilmington, Delaware

PINCKNEY, HARRIS & WEIDINGER, LLC


  **/s/ Adam Hiller**
Adam Hiller (DE No. 4105)
Donna Harris (DE No. 3740)
1220 North Market Street, Suite 950
Wilmington, Delaware 19801
(302) 504-1497 telephone
(302) 442-7046 facsimile
*ahiller@phw-law.com*

-and-

Geoffrey T. Raicht, Esquire
Andrew B. Kratenstein, Esquire
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173
(212) 547-5679 telephone
(212) 547-5444 facsimile
*graicht@mwe.com*
*akratenstein@mwe.com*

-and-

Kathryn R. Norcross (of counsel)
Senior Counsel
Dennis J. Early (of counsel)
Counsel-Legal Division
Federal Deposit Insurance Corporation
Legal Division
3501 Fairfax Drive, VS-D-
Arlington, VA  22226
(703) 562-2783
Email: knorcross@fdic.gov
Email: dearly@fdic.gov

*Counsel for the Federal Deposit Insurance*
*Corporation, in its Capacity as Receiver*